PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, AKA PETA, A DELAWARE NON-PROFIT CORPORATION; PERFORMING ANIMAL WELFARE SOCIETY, AKA PAWS, A CALIFORNIA NON-PROFIT CORPORATION; JEANNE ROUSH, OTTAVIO GESMUNDO, AND PAT DERBY, APPELLANTS, v. BOBBY BEROSINI, LTD., A NEVADA CORPORATION, AND BOHUMIL BEROUSEK, AKA BOBBY BEROSINI, INDIVIDUALLY, RESPONDENTS.

No. 21580

January 27, 1994                                   867 P.2d 1121

---

*Hale, Lane, Peek, Dennison & Howard* and *Robert D. Martin,* Las Vegas, for Appellant Gesmundo.

*Hirschkop & Associates,* Alexandria, Virginia, for Appellants PETA, Roush and Gesmundo.

*Watkiss & Saperstein,* Salt Lake City, Utah, for Appellants PETA and Roush.

*Anderson, Pearl, Hardesty, Lyle, Murphy & Stone,* Reno, for Appellants PAWS and Derby.

*Gewerter & Bohn,* Las Vegas; *Thomas Pitaro,* Las Vegas; *Hibbs, Roberts, Lemons, Grundy & Eisenberg,* Reno, for Respondents.

*Woodburn, Wedge & Jeppson* and *Suellen Fulstone,* Reno, for Amicus Curiae Nevada State Press Association.

*Susan Quig-Terry,* Las Vegas, for Amici Curiae Humane Society of the United States, et. al.

**OPINION**

By the Court, SPRINGER, J.:
In this litigation respondent Berosini claims that two animal

rights organizations, People for the Ethical Treatment of Animals (PETA) and Performing Animal Welfare Society (PAWS), and three individuals defamed him and invaded his privacy. Judgment was entered by the trial court on jury verdicts on the libel and invasion of privacy claims in the aggregate amount of $4.2 million. This appeal followed. We conclude that the evidence was insufficient to support the jury's verdict and, accordingly, reverse the judgment.

The two independent claims, libel and invasion of privacy, each involving clearly distinct principles of law, will be discussed in separate sections of this opinion.

## PART ONE:  *THE LIBEL ACTIONS*

The word *libel* comes from the Latin *Libellus,* "little book." The legal term derives from the practice in ancient Rome of publishing little books or booklets which were used by one Roman in defaming another. The "little book" in this case takes the form of a videotape which shows world-renowned animal trainer, Bobby Berosini, backstage before the beginning of his show, shaking and punching his trained orangutans and hitting them with some kind of rod. We conclude that the *libellus* is not libelous.

In a critical pretrial discovery order, the trial court limited Berosini's libel action to two categories, thus:

> 1.  "[T]he [video] tape and its distribution and showing to the public."
> 2.  "[T]he alleged statements of Defendants quoted in the Amended Complaint," namely, that all or some of the "Defendants had defamed Berosini by stating that Plaintiff Berosini regularly abuses his orangutans and has beaten them with steel rods, all of which is false."[1]

---

[1]After entry of the order limiting the libel action to the two mentioned categories, the defendants sought, through written interrogatories, to have Berosini give more detail as to who did what, and when, with reference to the defamation charges. Berosini did not respond to these questions to defendants' satisfaction, and the district court refused to compel him to do so. The court ruled that Berosini "need not identify each allegedly [sic] defamatory statement" and further ruled that Berosini would be limited in his proof to "those defamatory statements identified in discovery answers or depositions." We read this latter order to refer to the mentioned, already-narrowed two categories. This order did not, by its terms, countermand the previous order limiting Berosini's defamation proof to "the video tape and its distribution" and to unattributed statements that "Berosini regularly abuses his orangutans and has beaten them with steel rods."

The defendants in this case have repeatedly complained that they have not been put on notice as to which defendant is claimed to have made what actionable statements to whom. Defendants cannot be expected to search

The mentioned pretrial order frames the libel issues in this appeal:

1. Were the "defendants," or any of them, liable to Berosini by reason of distributing and showing the mentioned videotape?

2. Were the "defendants," or any of them, liable to Berosini by reason of their having said either, (a) that Berosini "regularly abuses his orangutans" or (b) that Berosini "has beaten them with steel rods?"

To create liability for defamation there must be:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm, or the existence of special harm caused by the publication.

Restatement (Second) of Torts § 558 (1965). Based on the absence of (a), a false and defamatory statement, we conclude that the two stated questions must be answered in the negative and that the judgment of the trial court must therefore be reversed.

### FIRST LIBEL CLAIM: *"[T]he tape and its distribution and showing to the public."*

It is immediately apparent that the "distribution" and "showing" of this particular "little book" cannot possibly be either

---

through scores of depositions and massive discovery materials to guess just what Berosini had in mind with respect to each defendant's supposed defamatory conduct. This problem was mitigated considerably, however, when the trial judge limited the defamation charges to the videotape and to the mentioned charges of regular abuse and use of a steel rod. In his answering brief, Berosini appears to agree that there are only two allowable categories of defamation. In opposition to defendants' charges that he had not adequately informed them concerning the specifics of the defamation claim, Berosini tells us in his brief:

In the present case Berosini specifically alleged the defamatory tapes and the words said to be actionable, to wit: ". . . Defendants have stated that Plaintiff BEROSINI regularly abuses his orangutans and has beaten them with steel rods, all of which are false."

Although Berosini may have considered some other conduct by one or another of the defendants as being actionable, in light of the trial judge's limiting order and Berosini's own argument that he did in fact "*specifically* allege the defamatory*" items on which he relied, we assume in this appeal that the libel charges are limited to those covered by the trial judge's order.

false or defamatory.[2] The videotape is not "false" because it is an accurate portrayal of the manner in which Berosini disciplined his animals backstage before performances. The videotape is not defamatory because Berosini and his witnesses take the position that the shaking, punching, and beating that appear on the tape are necessary, appropriate and "justified" for the training, discipline, and control of show animals. If Berosini did not think that the tape showed him doing anything wrong or disgraceful, he should not be heard to complain that the defendants defamed him merely by "showing" the tape.

Appellant Ottavio Gesmundo did the actual taping of Berosini. Gesmundo was a dancer in the Stardust Hotel's "Lido" floor show, at which Berosini's animal act was the principal attraction. Gesmundo claims that he was prompted to videotape Berosini's treatment of the animals because he had become aware of Berosini's conduct with the animals and thought that he would be in a better position to put an end to it if Berosini's actions were permanently recorded on tape. Gesmundo says that he had, on a number of occasions, heard the animals crying out in distress and that he had overheard "thumping noises" coming from the area backstage where the videotaping was eventually done. The area in question was demarked by curtains which kept backstage personnel from entering the staging area where Berosini made last-minute preparations before going on stage. By looking through the worn portions of the curtains, Gesmundo testified that backstage personnel were able to observe the manner in which Berosini disciplined his animals in the mentioned staging area. Berosini's position is that his actions depicted on the tape were a "proper" and "necessary" manner of treating these animals.

However motivated, Gesmundo did decide to record Berosini's treatment of the animals on his eight-millimeter home video recorder. From July 9 through July 16, 1989, Gesmundo placed his video camera in a place that would permit Berosini's actions to be recorded without Berosini's being aware of it. Gesmundo would go home each night and transfer that day's video recording onto a VHS tape. In doing this he would edit out the "dead-time," the time during which Berosini was not within the curtained area preparing to go on stage. The final tape which Gesmundo put together showed nine separate incidents, with the date superimposed on the daily taped images.

---

[2]A statement is defamatory when, "[u]nder any reasonable definition[,] such charges would tend to lower the subject in the estimation of the community and to excite derogatory opinions against him and to hold him up to contempt." Las Vegas Sun v. Franklin, 74 Nev. 282, 287, 329 P.2d 867, 869 (1958).

All of the members of this court have viewed the tape; and what is shown on the tape is clear and unequivocal: Berosini is shown, immediately before going on stage, grabbing, slapping, punching and shaking the animals while several handlers hold the animals in position. The tape also shows Berosini striking the animals with a black rod approximately ten to twelve inches long. Perhaps Berosini has some explanation or justification for this conduct; but, the videotape accurately portrays what he was doing to these animals on at least nine different occasions. Berosini, himself, was forced to admit at trial that there was no visual inaccuracy in the images represented on the tape. Berosini's counsel and Berosini's video expert, Dennis Cooper, also agree to the accuracy of what is portrayed on the tape. There is no credible evidence that Gesmundo altered the tape in any manner that would render the tape, in any sense of the word, *false.* Had Gesmundo in some way been able to take this tape and superimpose false images or sounds, it might be possible to say that he falsified the tape, but there is no evidence this was the case. There was no evidence presented which would support a conclusion that the tape, either visually or auditorily, was, of itself, false.[3]

---

[3]Visual accuracy has been conceded and the only possible question is whether the sound was so materially altered as to render the tape *false.* The only modification of the tape was done when the tape was transferred from the VHS format to a three-quarter inch format by a professional video technologist, Alan Kartes. Kartes testified that in the transfer process he enhanced the amateur video effort by turning up the light and the sound so that it would more clearly and accurately represent the subject of the taping. Berosini also claims that taking out the dead time in the manner stated made the tape falsely appear as if the beatings were constant and close together in time. The consecutively-dated tape clearly shows, however, that the episodes are intermittent in nature and not one long "torture session" for the animals. Each episode shows Berosini coming from another backstage area into the curtained area, and there is no way of mistaking this tape for one, prolonged beating. None of the defendants ever said or pretended that Berosini engaged . in "marathon" beatings; and there is nothing in the least misleading about the way the tape was put together. The tape merely shows that Berosini did (on at least nine consecutive days) "regularly" beat his animals before they went on stage.

The only other conceivable scenario out of which "falsity" might be claimed with regard to the videotape itself would have to be found in Berosini's argument that he was "set up"—that the animal rights activists were out to get him and that they teased his animals in order to rile them up and so make it necessary for him to be violent with the animals in order to control them. When we address this argument we must bear in mind that even if Berosini's charges were true, it does not mean that the tape itself is in any way false. Berosini can only argue that even though he was in fact violent with his animals, it was necessary to be violent in order to discipline and control them. Even if Berosini had been entrapped into beating his animals

The tape, of course, has nothing to do with whether Berosini was *justified* in punishing the animals; it just shows that he did in fact punish them. The showing and distributing of this tape was, plainly and simply, only the showing of this *fact*. Berosini could have explained, as he did, that he had to exert violence against the animals in order to discipline them or to get them quieted down or to ensure the audience's safety, but this has nothing to do with the truth or falsity of the tape. The "distribution and showing" of the videotape in no way interferes with Berosini's right to present possible justifications for his actions. As the distributors of the tape had the right to show this *true* tape, so Berosini had the right to explain his actions on the tape. If in fact some of the defendants had intentionally interfered with Berosini's act and had, as Berosini claims, provoked the animals to the point that it was necessary for him to do what he is shown doing on the tape, then, of course, Berosini might have had some tort action other than a libel action, perhaps a conspiracy action, against persons who, he claims, were wrongfully and intentionally interfering with his act.[4]

Unless the tape had been materially altered to portray something different from what Berosini was actually doing, then defendants have not made a "false" statement about Berosini—they have merely shown to the world how Berosini treated his

by overzealous animal rights activists, this would have no bearing on the truth or falsity of the tape itself. No matter how one interprets what Berosini was shown to be doing on the tape, the fact remains that the tape does truly show Berosini beating the animals—"regularly."

[4]Berosini did try to pursue a conspiracy tort action against the defendants for these activities; however, the district court dismissed this action prior to trial.

The trial court also dismissed Berosini's false light invasion privacy action, after verdict and judgment. Berosini has not cross-appealed, so that this tort is not before us. We note also that during the oral argument on this appeal, Berosini's counsel complained that the tape resulted in Berosini's actions being "taken out of context," which goes to the very essence of the now unavailable false light tort. There are cases indicating that the false light invasion of privacy may be committed even when the publication is not defamatory. "[W]hile a false light claim may be defamatory, it need not be." Machleder v. Diaz, 801 F.2d 46, 55 (2d Cir. 1986), *cert. denied,* 479 U.S. 1088 (1987). "The false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation." Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir. 1983). Since the tape itself is not false, and since the tape itself is not defamatory, clearly no defamation action can arise out of distribution of the tape. Because the false light tort is not a subject of this appeal, we are not required to decide whether the tort was committed by any of the defendants in this case.

animals on nine separate occasions,[5] backstage, immediately preceding his act. As the evidence does not support a conclusion that the tape was visually or auditorily "false," we conclude that Berosini presented insufficient evidence to support the jury's verdict with respect to this tape.

SECOND LIBEL CLAIM: *"Berosini regularly abuses his orangutans."*

Whether the violence portrayed in the videotape is seen as abuse or proper discipline is a matter of wide-ranging difference of opinion among the witnesses in this case and within the public in general. There is no doubt that at the time the tape was first shown in Las Vegas on June 28, 1989, some of the present defendants did comment publicly on the videotape's content. One example is found in Berosini's response to interrogatories, in which he testified:

> Beginning on July 28, 1989, and continuing thereafter, [defendant] Jeanne Roush appeared on local television and wrongfully stated that the Plaintiff "abuses" his animals and beats them severely.

The testimony at trial exhibited a very wide spectrum of opinion as to whether Berosini's actions constituted *abuse* or was proper and acceptable disciplinary action. For example, one of Berosini's experts, Kenneth Gould, Ph.D., a professor at Emory University, whose Primate Center provided orangutans for Berosini's use, testified that the beatings portrayed in the videotape "show appropriate and necessary action on his part with regard to discipline of animals under his control." Berosini claimed that extra disciplinary measures were required because certain stage hands and performers had been making "monkey sounds" and were "hissing" and making "giggling sounds." According to Berosini, these taunting sounds (which, incidentally, are not detectable on the tape), agitated the animals and required him to exert additional force on the animals in order to secure the safety of his audiences. Whether it was more prudent for Berosini to have tried to put a stop to the supposed teasing or, as he appears to have done, to escalate his pre-act violence on the animals, is also a matter of opinion; and, again, whether the beatings portrayed in the tape are justified or constitute animal abuse is a matter involving a broad spectrum of opinion, lay and expert.

---

[5]Bobby Berosini, Berosini's son, testified that he had seen his father strike the animals with a black rod at times other than those during which Berosini was being filmed by the Gesmundo camera.

The animal rights activists all see Berosini's treatment of his animals as cruel and abusive, an *opinion* shared by the defendants in this case. Jane Goodall, Ph.D., Director of the Gombe Stream Research Centre and expert in primate behavior viewed the tape in this manner:

> In this video, I saw the following sequence of events: A door opened and five men, each leading a young orang by one hand, walked along a bare passage towards the (presumably concealed) camera. With these ten primates was a sixth man, wearing a bow tie. At the end of the passage the whole group stopped. The orangs, still standing upright, appeared quiet and well behaved. I saw no signs of disobedience in any of them at any time. Yet as they stood there—apparently waiting to go onstage for a performance—the man in the bow tie began to abuse the orangs. Suddenly he would seize one of them by its hair and pull and push it towards and away from him with violent movements. He would slap one of them, or punch it with his fist. Most of the abuse was directed towards the larger orangs. Once he pulled one round to face him, then slapped it hard over the muzzle. Occasionally he hit one of them over the shoulders with a heavy implement, shaped like a conductor's baton.
>
> During these entirely unprovoked assaults the handlers restrained the orangs by both arms, holding them upright. They gave the impression that they were expecting the abuse and positioning their charges in readiness to receive it.

Dr. Goodall was of the opinion that what she saw on the videotape involved "severe psychological cruelty as well as physical abuse," and recommended that the five orang-utans depicted in the videotape "be confiscated immediately and placed in the hands of caring and responsible people who could try to cure them of their psychological (and perhaps physical) wounds."

Obviously, there are persons who disagree with Dr. Goodall and who approve of this kind of violence in the training of animals. Berosini, himself, testified that in his opinion it is often necessary to hit an orangutan to keep it under control. Although Berosini may be entitled to hold his own opinion on these matters, he does not claim that the defendants in this case or their experts did not honestly and sincerely hold the contrary opinion that the violence portrayed on the videotape constituted animal cruelty and abuse.[6]

---

[6]Some of Berosini's own witnesses also believed that the tapes disclosed untoward behavior on the part of Berosini. For example, Lewis McKeen, Stardust stage manager, said that the tapes "looked like Mr. Berosini was . . . hurting the animals . . . ." Berosini himself admitted that his conduct on the videotape looks like a "vicious beating." Any viewer of this tape is entitled

The opinion expressed by any defendants or by any of defendants' witnesses in this case that Berosini's activities, as represented in the videotape, constituted abuse or cruelty falls squarely into a class of opinion described by Prosser and Keeton as "evaluative opinions." *Prosser and Keeton on Torts* 814 (W. Page Keeton, ed.; 5th ed. 1984). An *evaluative* opinion involves a value judgment based on true information disclosed to or known by the public. Evaluative opinions convey the publisher's judgment as to the quality of another's behavior and, as such, it is not a statement of fact. "Under the *Restatement (Second)* virtually all 'evaluative only' opinions would be nonactionable, since they are by definition based on disclosed facts . . . . The statement that 'Jane Doe did not deserve the Oscar for her movie role because it was a shallow, two-bit, hack performance' is not actionable even in the face of ironclad proof that every other living being who has ever seen the movie loved the performance." Rodney A. Smolla, *Law of Defamation* § 6.05[2], page 6–20 (1988) (citations omitted). The divergent evaluative opinions expressed in the case now before us are subject to debate. Neither is "right" or "wrong."

In the present case, everyone involved has seen the "movie;" and all the facts upon which opinions were based were "disclosed" in the videotape itself. Those who were of the opinion that Berosini was being abusive to the animals were making an evaluative judgment based on the facts portrayed in the video. All viewers of that video are free to express their opinion on the question of whether they think Berosini was being cruel to those animals, and no one can be successfully sued for expressing such an evaluative opinion—even if it is "wrong." There is no such thing as a false idea or a wrong opinion. *See* Nevada Ind. Broadcasting Corp. v. Allen, 99 Nev. 404, 410, 664 P.2d 337, 341-42 (1983).

We are dealing here with two very strongly held, contrary opinions on how animals should be treated. We agree completely with *amicus,* Nevada State Press Association, Inc., that "[w]ithout taking sides on the activities or the strongly-held beliefs of either party, it is nevertheless clear that open and robust debate on controversial and contested issues of this kind could not long survive a succession of such multi-million dollar judgments." We believe that "open and robust debate" should be encouraged in Nevada and not deterred by what has appeared to appellant

---

to the opinion that Berosini "ab-used," that is to say, used the animals in an improper and wrongful manner. There can be no clear and universally accepted definition of animal abuse, and the line between proper treatment and improper treatment and abuse is indistinct.

Gesmundo and others as a "slap" suit (a law suit whose principal intent and purpose is not to settle a legitimate dispute but to terrorize those who wish to involve themselves in public issues such as this one).[7]

Finally, the constitutional privilege provided by the Nevada Constitution protects the animal rights activists from defamation liability in this case. Article 1, section 9, of the Nevada Constitution provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." Citing to the Nevada Constitution, in Culinary Workers Union v. Eighth Judicial Dist. Court, 66 Nev. 166, 207 P.2d 990 (1949), this court observed that the "constitutional right to free speech . . . embraces every form and manner of dissemination of ideas held by our people." *Id.* at 173, 207 P.2d at 993. "Free speech . . . must be given the greatest possible scope and have the least possible restrictions imposed upon it, for it is basic to representative democracy." *Id.* at 173, 207 P.2d at 994 (citations omitted). In *Culinary Workers,* the district court issued a restraining order against peaceful picketing. The Culinary Workers Union sought a writ of prohibition countermanding the restraining order. One of the grounds asserted by the parties opposed to the Culinary Workers Union's application for the prohibition writ was that the "unfair" sign used on the picket line was untruthful. *Id.* at 176, 207 P.2d at 995 (citations omitted). With regard to the Culinary Workers Union's use of the word "unfair" on picket signs, this court ruled in *Culinary Workers,* that "[s]uch normal statements or claims which in general convey the idea that a business is '"unfair" to organized labor' are no more than statements of opinion and are not subject to judicial restraint." *Id.* at 177, 207 P.2d at 995.

Any of the defendants in this case who might have said that Berosini's videotaped beatings were abusive are in a very similar position to the Culinary Workers Union members in *Culinary Workers* who called an employer "unfair." The existence of the undisputed "fact" of the videotaped beatings makes the state-

---

[7]Gesmundo argues, quite credibly, that once it was firmly established that the tape was not "false," Berosini should have dropped the lawsuit and not have pursued it based on defendants' having stated their opinions that the tape portrayed abuse. Gesmundo points out in his brief that when Berosini first filed his complaint, he alleged that the videotape was altered and distorted and that the actions depicted in the tape did not occur. By trial time, Berosini admitted that the tapes were visually accurate and tried to excuse his conduct. At this point, Berosini should have realized that he did not have a libel suit based on the mere expression of opinion arising out of the true facts portrayed on the tape. Whether this is or is not a "slap" suit, deterrence of the free expression of ideas and opinions by the filing of lawsuits should not be tolerated.

ments of "defendants" about what is seen on the tape merely evaluative comments based on known facts. "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection" under the federal constitution, as well as under the Nevada Constitution as interpreted in the *Culinary Workers* case. Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990). The libel judgment, based on the statement "Berosini regularly abuses his orangutans," therefore, must be reversed on constitutional as well as common law grounds.

### THIRD LIBEL CLAIM: *Berosini "has beaten them with steel rods."*

With regard to the allegedly false statements made by defendants that Berosini "has beaten [the orang-utans] with steel rods," we have something that comes a little closer to being a statement of fact that might be subject to being characterized as either true or false. The statement that Berosini "has beaten them with . . . rods" is obviously a true statement; it is on tape. That he has "beaten them with *steel* rods" is not necessarily true; and, if some defendant did accuse Berosini of using a *steel* rod, then perhaps a false statement of fact has been made about the kind of instrument Berosini used to beat the animals.

Although Berosini says that he used a taped *wooden* rod and admits that he hit the animals from time to time with such a rod, none of these rods was produced by Berosini at the trial. Berosini lost or destroyed whatever kind of rod or rods he is shown on the video tape to be using to hit the animals. The chastening rod was lost somehow after this litigation was in progress. Berosini bore the burden below of proving that the statement was false. Posadas v. City of Reno, 109 Nev. 448, 453, 851 P.2d 438, 442 (1993).[8] Furthermore, the failure of a party to produce evidence on an issue peculiarly within his own knowledge raises an inference that the concealed information is unfavorable. Isola v. Sorani, 47 Nev. 365, 368, 222 P. 796, 797 (1924); State of Nevada v. McLane, 15 Nev. 345, 369 (1880); *see also* Nev. Tax. Com. v. Hicks, 73 Nev. 115, 129, 310 P.2d 852, 859 (1957).

The statement that the rod was steel and was taped with black

---

[8]Berosini filed a motion for leave to file supplemental citation of authority with this court based upon the recent *Posadas* opinion. We have already considered *Posadas* and therefore deny Berosini's motion.

tape originates with Gesmundo. Two different stage hands told Gesmundo that Berosini was using a steel rod to beat the animals. Gesmundo told a number of animal rights people that the rod was made of steel. Although we view the question of what the rod was made of to be largely immaterial, we did note in watching the video that in the July episode, Berosini dropped whatever kind of rod it was that he had in his hand, and we heard an unmistakable ringing sound that sounded strikingly similar to a *steel* rod being dropped. We certainly do not conclude from our own viewing of the tape that Berosini was lying or that the rod was steel rather than wood, but hearing this sound makes the listener wonder whether the lost rod or rods were what Berosini claimed them to be.

One's saying that the rods with which Berosini is shown striking the animals are *steel* rods is not in itself defamatory. Once we all know (and see on television) that Berosini strikes his animals with some kind of black rod, it is unlikely that we would change our opinion or have a more "derogatory opinion against him" based on the rods' being steel rather than wood. *See* Las Vegas Sun v. Franklin, 74 Nev. 282, 287, 329 P.2d 867, 869 (1958). We do not have to reach the question as to whether proof is sufficient to prove falsity in this regard, because, true or false, saying that Berosini beats his animals "with steel rods" is not, as a matter of law, defamatory under the circumstances of this case. The composition of the rods is of little moment; if the rods were wooden, saying that they were steel does not defame Berosini.

None of the Berosini witnesses attributed any particular injury or damages to Gesmundo's statements that the rod was made out of steel rather than wood. A libel judgment of the present magnitude, based solely on a charge that defendants falsely accused Berosini of using a tape-wrapped *steel* rod instead of a tape-wrapped *wooden* rod cannot possibly stand.

We conclude that publication of the videotape itself, is not libelous. Any statements made by unspecified defendants to the effect that Berosini "regularly abuses his orangutans" are, given the context of the videotape on which the opinions of abuse were necessarily made, a matter of evaluative opinion and therefore not libelous. The underlying *fact,* namely, the manner in which Berosini is seen to be treating his animals in the videotape, provides the framework in which the expressed, evaluative opinions of *abuse* must be seen, that is to say, as expressions of pure opinion and not statements of fact. So long as the factual basis for the opinion is readily available, the persons receiving the opinion are in a position to judge for themselves the validity of the opinion. *See* Leers v. Green, 131 A.2d 781, 787-88 (N.J. 1957).

Finally, whether the rods in question were steel or wood is immaterial; if the rods were in fact wood, saying they were steel cannot be said to defame Berosini in this context.[9]

### PART TWO: *THE INVASION OF PRIVACY ACTIONS*

The jury in this case awarded two different species of privacy tort damage awards, each based on a different aspect of a charged invasion of Berosini's privacy. The first species of privacy tort is "intrusion on seclusion," for which Berosini was awarded $250,000.00 against Gesmundo alone. The second species of invasion of privacy upon which the jury returned a verdict in this case was for the appropriation of Berosini's name or likeness. For commission of this tort the jury awarded Berosini $500,000.00 against PETA and $250,000.00 against Jeanne Roush. For the sake of convenience we will refer to these two torts as the tort of *intrusion* and the tort of *appropriation.*

The law relating to a protectable "right to privacy" is an American invention, developing over a period of approximately the last one hundred years.[10] The law in its present form was conceived almost entirely by Professor William Prosser, who, in a 1960 law review article in the *California Law Review,* expounded that the right of privacy gave rise not to one but to four different tort actions, sometimes called "Prosser's Four Torts of Privacy."[11]

These four torts found their way into the *Restatement*—perhaps because Prosser was the American Law Institute Reporter who drafted the *Restatement* language—and have been adopted, often verbatim, by the vast majority of American jurisdictions.[12] The

---

[9]Much of the briefing in this case relates to whether the defendants are protected from liability by the First Amendment to the United States Constitution because there is no showing of "actual malice." Defendants in this case claim to be protected by current federal constitutional doctrine which holds that traditional tort rules governing the law of libel are subject to overriding constraints of the First Amendment. We do not reach the question of actual or constitutional malice (although it is extremely clear that Berosini has not proven by clear and convincing evidence that any defendant made a false or defamatory statement known to be false or with reckless disregard of the truth) because this appeal is easily decided under traditional tort rules and under the Nevada Constitution.

[10]The genesis of the right to privacy is traceable to a law review article, Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890); William L. Prosser, *Privacy,* 48 Cal.L.Rev. 383 (1960) (hereinafter "Prosser").

[11]Prosser, *supra* note 9.

[12]Restatement (Second) of Torts, § 652A, appendix, at 268-69 (1977) (listing the states recognizing the privacy torts); Prosser at 386-88, *supra* note 9.

four species of privacy tort are: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the name or likeness of another; (3) unreasonable publicity given to private facts; and (4) publicity unreasonably placing another in a false light before the public.[13]

Nevada has long recognized the existence of the right to privacy.[14] A jurist noted some fifty years ago that "[i]t may be conceded that the doctrine of privacy in general is still suffering the pains of its birth."[15] It is still suffering; accordingly, we undertake in this opinion to offer some guidance on the right of privacy as it is recognized in Nevada, at least with regard to the two specific torts involved in this appeal: the tort of intrusion and the tort of appropriation.

Additionally, we recognize today another tort, a cousin to the "Prosser Four" but not, strictly speaking, a privacy tort. By virtue of statute, NRS 598.980-.988, a fifth, tort must be considered and discussed in connection with the privacy judgments awarded here. This fifth "privacy" tort is the tort of invasion of the *right of publicity*. With this background in mind, let us now proceed to discuss the privacy tort of *intrusion* for which Berosini was awarded damages in this case.

FIRST INVASION OF PRIVACY ACTION: *Intrusion*

*You had to live—did live, from habit that became instinct—in the assumption that every sound you made was overheard and, except in darkness, every movement scrutinized.*

George Orwell
*1984*

Berosini claims that one of the Stardust dancers, Ottavio Gesmundo, has intruded upon his "seclusion" backstage, before his act commenced. We support the need for vigilance in preventing unwanted intrusions upon our privacy and the need to protect ourselves against the Orwellian nightmare that our "every movement [be] scrutinized." The question now to be examined is whether Gesmundo's inquiring video camera gives cause for concern over privacy and gives rise to a tort action against Gesmundo for invasion of Berosini's privacy.

---

[13]Restatement at 376, *supra* note 11.

[14]*See* Montesano v. Donrey Media Group, 99 Nev. 644, 649, 668 P.2d 1081, 1084 (1983), *cert. denied,* 466 U.S. 959 (1984) (adopting the Restatement formulation); M & R Investment Co. v. Mandarino, 103 Nev. 711, 718-19, 748 P.2d 488, 493 (1987); Norman v. City of Las Vegas, 64 Nev. 38, 177 P.2d 442 (1947) (implicitly recognizing an action for invasion of privacy).

[15]Clayman v. Bernstein, 38 Pa. D & C 543 (Ct. Common Pleas, Penn, 1940).

Although the problems which the tort of intrusion seeks to remedy are well-recognized, the tort of intrusion has only recently gained the attention of this court. In M & R Investment Co. v. Mandarino, 103 Nev. 711, 748 P.2d 488 (1987), we faced the question of whether appellant, "a twenty-two year old man, disguised in dark glasses, a false mustache and slicked down hair, who by virtue of his skill at counting cards, [won] a great deal of money in a short period of time" had stated a cognizable claim for intrusion against the casino personnel who confiscated his winnings, had him arrested, photographed him, and distributed his photograph to other casinos. *Id.* at 719, 748 P.2d at 493. We answered this question with an emphatic "No," noting that the appellant, so conspicuously attired, could have had no subjective expectation that "casino personnel [would] turn a blind eye to his presence." This court held that even viewing the facts in the light most favorable to the appellant, such an expectation was patently unreasonable and would thus not give rise to a tort action. *Id.* at 719, 748 P.2d at 493.

The *Restatement,* upon which this court has previously relied for guidance in this area,[16] formulates the tort of intrusion in terms of a physical invasion upon the "solitude or seclusion" of another,[17] the rationale being that one should be protected against intrusion by others into one's private "space" or private affairs. To Prosser, these torts were personal injury actions, and he saw as examples of tortious activity the meddling conduct of eavesdroppers, the unpermitted opening of others' mail, and the making of illegal searches and seizures.[18] Simply put, the intrusion tort gives redress for interference with one's "right to be left alone."

To recover for the tort of intrusion, a plaintiff must prove the following elements: (1) an intentional intrusion (physical or otherwise); (2) on the solitude or seclusion of another; (3) that would be highly offensive to a reasonable person.

In order to have an interest in seclusion or solitude which the law will protect, a plaintiff must show that he or she had an actual expectation of seclusion or solitude and that that expectation was objectively reasonable. M & R Investment Co. v. Mandarino, 103 Nev. 711, 719, 748 P.2d 488, 493 (1987). Thus, not every

---

[16]*See Montesano,* 99 Nev. at 649, 668 P.2d at 1084.

[17]Restatement, § 652 B at 378, *supra* note 11.

[18]Prosser at 392, *supra* note 9.

expectation of privacy and seclusion is protected by the law. "The extent to which seclusion can be protected is severely limited by the protection that must often be accorded to the freedom of action and expression of those who threaten that seclusion of others." 2 Fowler v. Harper, et al., *The Law of Torts*, § 9.6, at 636 (2d ed. 1986). For example, it is no invasion of privacy to photograph a person in a public place; *see, e.g.,* Gill v. Hearst Publishing Co., 253 P.2d 441 (Cal. 1953); or for the police, acting within their powers, to photograph and finger-print a suspect. *See, e.g.,* Norman v. City of Las Vegas, 64 Nev. 38, 177 P.2d 442 (1947). Bearing this in mind, let us examine Berosini's claimed "right to be left alone" in this case and, particularly, the nature of Berosini's claim to seclusion backstage at the Stardust Hotel.

Berosini's "Invasion of Privacy" claim in his Second Claim for Relief contains no factual averments and refers the reader back to paragraphs 1 through 18 of the First Claim for Relief, where one is required to search for some factual basis for Bero-sini's charging of the intrusion tort. The only factual allegations that appears to have any relation to the intrusion tort are found in paragraph 12 of the first claim, a paragraph that relates only to defendant Gesmundo. (Gesmundo is the only defendant against whom a judgment was entered on the intrusion tort.) Paragraph 12 reads as follows:

> 12. Defendant GESMUNDO unlawfully trespassed onto the Stardust Hotel with a video camera in July, 1989. Video cameras and other recording equipment are strictly prohib-ited at the Stardust Hotel. Defendant GESMUNDO unlaw-fully filmed Plaintiff BEROSINI disciplining the orangutans without the Plaintiff's knowledge or consent and just after Defendant GESMUNDO and others agitated the orangutans.

The focus, then, of Berosini's intrusion upon seclusion claim is Gesmundo's having "trespassed onto the Stardust Hotel with a video camera" and having "unlawfully filmed Plaintiff Berosini disciplining the orangutans without the Plaintiffs knowledge or consent." It is of no relevance to the intrusion tort that Gesmundo trespassed onto the Stardust Hotel, and it is of no moment that Gesmundo might have "unlawfully" filmed Berosini, unless at the same time he was violating a justifiable expectation of privacy on Berosini's part. The issue, then, is whether, when Gesmundo filmed Berosini "disciplining the orangutans without the Plain-tiff's knowledge or consent," Gesmundo was intruding on "the solitude or seclusion" of Berosini.

The primary thrust of Berosini's expectation of privacy backstage at the Stardust was that he be left alone with his animals and trainers for a period of time immediately before going onstage. Berosini testified that "as part of his engagement with the Stardust," he demanded that "the animals be left alone prior to going on stage." Throughout his testimony, over and over again, he stresses his need to be alone with his animals before going on stage. Berosini's counsel asked him what his "purpose" was in requiring that he be "secured from the other cast members and people before [he] went on stage." Berosini's answer to this question was: "I have to have the attention . . . I have to know how they think. I cannot have them drift away with their mind . . . ."; and, further, "it is very important that before the show I have the orangutans' attention and I can see what they think before I take him on stage . . . ." Significantly, Berosini testified that his "concern for *privacy* was *based upon the animals*" and that his "main concern is that [he] have no problems going on stage and off stage," that is to say that no one interfere with his animals in any way immediately before going on stage. (Emphasis added.)

Berosini was concerned that backstage personnel not "stare at the orangutans in their faces. The orangutans will interpret [this] as a challenge." It is clear that Berosini's "main concern" was that he be provided with an area backstage in which he could get the animals' undistracted attention before going on stage. He never expressed any concern about backstage personnel merely seeing him or hearing him during these necessary final preparations before going on stage; his only expressed concern was about possible *interference* with his pre-act training procedures and the danger that such interference might create with respect to his control over the animals. Persons who were backstage at the Stardust could hear what was going on when "Berosini [was] disciplining his animals," and, without interfering with Berosini's activities, could, if they wanted to, get a glimpse of what Berosini was doing with his animals as he was going on stage.[19]

What is perhaps most important in defining the breadth of Berosini's expectation of privacy is that in his own mind there was nothing wrong or untoward in the manner in which he disciplined the animals, as portrayed on the videotape, and he expressed no concern about merely being seen or heard carrying out these disciplinary practices. To Berosini all of his disciplinary activities were completely "justified." He had noting to hide—nothing to be private about. Except to avoid possible distraction

---

[19]The record reveals that a number of people were readily able to see or hear what was going on in Berosini's "private" area.

of the animals, he had no reason to exclude others from observing or listening to his activities with the animals. Berosini testified that he was not "ashamed of the way that [he] control[ed] [his] animals"; and he testified that he "would have done the same thing if people were standing there because if anybody would have been standing there, it was visibl[e]. It was correct. It was proper. It was necessary."

As his testimony indicates, Berosini's "concern for privacy was based upon the animals," and not upon any desire for sight/ sound secrecy or privacy or seclusion as such; and he "would have done the same thing if people were standing there." The supposed intruder, Gesmundo, was in a real sense just "standing there." By observing Berosini through the eye of his video camera, he was merely doing what other backstage personnel were also permissibly doing. The camera did not interfere in any way with Berosini's pre-act animal discipline or his claimed interest in being "secured from the other cast members and people before [he] went on stage."[20] Having testified that he would have done the same thing if people were standing there, he can hardly complain about a camera "standing there."

If Berosini's expectation was, as he says it is, freedom from distracting intrusion and interference with his animals and his pre-act disciplinary procedures, then Gesmundo's video "filming" did not invade the scope of this expectation. Gesmundo did not intrude upon Berosini's *expected* seclusion. *See, e.g.*, Kemp v. Block, 607 F.Supp. 1262, 1264 (D. Nev., 1985) ("This Court finds that the plaintiff knew that other persons could overhear. He, therefore, had no reasonable expectation of privacy"); McClain v. Boise Cascade Corp., 533 P.2d 343, 346 (Or., 1975) ("plaintiff conceded that his activities which were filmed could have been observed by his neighbors or passersby"). For this reason the tort of intrusion cannot be maintained in this case.[21]

On the question of whether Gesmundo's camera was *highly*

---

[20]*See* discussion, *supra,* at 95.

[21]We do not find it necessary to discuss the question of reasonability (objective expectation of privacy) of Berosini's privacy interests because, as said, his concern was not with being seen. Nevertheless, we note that Berosini's being a public figure militates against his privacy claim. It is probably not reasonable for a well known, headliner entertainer to expect that his picture will not be taken backstage at his place of performance, even when it is a violation of company rules. Furthermore, we note that there is, generally speaking, a reduced objective expectation of privacy in the work-place. *See, e.g.*, Baggs v. Eagle-Picher Industries, 957 F.2d 268, 275 (6th Cir. 1992), *cert. denied*, 113 S.Ct. 466 (1992); Yarbray v. Southern Bell Tel. & Tel. Co., 409 S.E.2d 835 (Ga. 1991).

offensive to a reasonable person, we first note that this is a question of first impression in this state. As might be expected, "[t]he question of what kinds of conduct will be regarded as a 'highly offensive' intrusion is largely a matter of social conventions and expectations." J. Thomas McCarthy, *The Rights of Publicity and Privacy,* § 5.10(A)(2) (1993). For example, while questions about one's sexual activities would be highly offensive when asked by an employer, they might not be offensive when asked by one's closest friend. *See* Phillips v. Smalley Maint. Services, 435 So.2d 705 (Ala. 1983). "While what is 'highly offensive to a reasonable person' suggest a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion." Miller v. National Broadcasting Co., 232 Cal.Rptr. 668, 678 (Cal.Ct.App. 1986); *see, e.g.,* Lovgren v. Citizens First Nat. Bank, 534 N.E.2d 987 (Ill. 1989); Kaiser v. Western R/C Flyers Inc., 477 N.W.2d 557, 562 (Neb. 1991); Smith v. Jack Eckerd Corp., 400 S.E.2d 99 (N.C.App. 1991). A court considering whether a particular action is "highly offensive" should consider the following factors: "the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Miller,* 232 Cal.Rptr. at 679; 5 B. E. Witkin, *Summary of California Law, Torts* § 579 at 674 (9th ed. 1988).

Three of these factors are of particular significance here and, we conclude, militate strongly against Berosini's claim that Gesmundo's conduct was highly offensive to a reasonable person. These factors are: the degree of the alleged intrusion, the context in which the actions occurred, and the motive of the supposed intruder. First, we note the nonintrusive nature of the taping process in the instant case. Berosini was concerned with anyone or anything interfering with his animals prior to performance. The camera caused no such interference. Neither Berosini nor his animals were aware of the camera's presence. If Gesmundo had surprised Berosini and his animals with a film crew and had caused a great commotion, we might view this factor differently. *See generally Miller,* 232 Cal.Rptr. 668. On the contrary, it appears from these facts that any colorable privacy claims arose not from the actual presence of the video camera but from the subsequent use to which the videotape was put.

Secondly, as has been discussed fully above, the context in which this allegedly tortious conduct occurred was hardly a model of what we think of as "privacy." We must remember that

the videotaping did not take place in a private bedroom (*see Miller,* 232 Cal. Rptr. at 668), or in a hospital room (*see* Estate of Berthiame v. Pratt, 365 A.2d 792, 796 (Me. 1976)), or in a restroom (*see* Harkey v. Abate, 346 N.W.2d 74 (Mich.Ct.App. 1983)), or in a young ladies' dressing room (*see* Doe by Doe v. B.P.S. Guard Services Inc., 945 F.2d 1422 (8th Cir. 1991)), or in any other place traditionally associated with a legitimate expectation of privacy. Rather, Gesmundo filmed activities taking place backstage at the Stardust Hotel, an area where Gesmundo had every right to be, and the filming was of a subject that could be seen and heard by any number of persons. This was not, after all, Berosini's dressing room; it was a holding area for his orangutans.

Finally, with regard to Gesmundo's motives, we note that Gesmundo's purpose was not to eavesdrop or to invade into a realm that Berosini claimed for personal seclusion. Gesmundo was merely memorializing on tape what he and others could readily perceive. Unlike the typical *intrusion* claim, Gesmundo was not trying to pry, he was not trying to uncover the covered-up. Although Berosini envisioned Gesmundo to be engaged in a conspiracy with others (as put in the Answering Brief) "to put an end to the use of animals in entertainment," as noted in note 3, *supra,* the conspiracy charges in Berosini's complaint were dismissed. Furthermore, even if Gesmundo was conspiring to put an end to the use of animals in entertainment, this is not the kind of motive that would be considered highly offensive to a reasonable person. Many courts, and Professor Prosser, have found the inquiry into motive or purpose to be dispositive of this particular element of the tort. *See Prosser and Keeton on Torts* § 117 at 856 (W. Page Keeton, ed.; 5th ed. 1984). For example, in *Estate of Berthiame,* 365 A.2d at 792, the court held that a doctor who photographed a dying patient against his will could be held liable for intrusion, in part because the doctor was not seeking to further the patient's treatment when he photographed him. *Id.* at 796. Similarly, in *Yarbry v. Southern Bell Tel. & Tel. Co.,* 409 S.E.2d 835 (Ga. 1991), the court held that an employee who claimed that her employer pressured her regarding her testimony in an employment discrimination suit brought against the company, could not state a claim for intrusion because the employer was motivated by his desire to protect the company's interests. *Id.* at 837; *see also* Beggs v. Eagle-Picher Industries, 957 F.2d 268, 275 (6th Cir. 1992), *cert. denied,* 113 S.Ct. 466 (1992); Saldana v. Kelsey-Hayes Co., 443 N.W.2d 382, 384 (Mich.Ct.App. 1989).

While we could reverse Berosini's intrusion upon seclusion

judgment solely on the absence of any intrusion upon his actual privacy expectation, we go on to conclude that even if Berosini had expected complete seclusion from prying eyes and ears, Gesmundo's camera was not "highly offensive to a reasonable person" because of the nonintrusive nature of the taping process, the context in which the taping took place, and Gesmundo's well-intentioned (and in the eyes of some, at least, *laudable*) motive. If Berosini suffered as a result of the videotaping, it was not because of any tortious intrusion, it was because of subsequent events that, if remediable, relate to other kinds of tort actions than the *intrusion* upon seclusion tort.

## SECOND INVASION OF PRIVACY ACTION:
### *Appropriation*

We now draw our attention to the other privacy tort pursued by Berosini in this case, namely, the tort of invasion of privacy based upon appropriation of name or likeness. There is considerable confusion in the cases and in the literature regarding this tort, primarily because the difference between the appropriation tort and the right of publicity tort is often obscured. The common law appropriation tort ordinarily involves the unwanted and unpermitted use of the name or likeness of an *ordinary, uncelebrated* person for advertising or other such commercial purposes, although it is possible that the appropriation tort might arise from the misuse of another's name for purposes not involving strictly monetary gain. The right of publicity tort, on the other hand, involves the appropriation of a *celebrity's* name or identity for commercial purposes.[22] The distinction between these two torts is the interest each seeks to protect. The appropriation tort seeks to protect an individual's personal interest in privacy; the personal injury is measured in terms of the mental anguish that results from the appropriation of an ordinary individual's identity. The right to publicity seeks to protect the *property* interest that a celebrity has in his or her name; the injury is not to personal privacy, it is the economic loss a celebrity suffers when someone else interferes with the property interest that he or she has in his or her name. We consider it critical in deciding this case that recognition be given to the difference between the *personal,* injured-feelings quality involved in the appropriation privacy tort and the *property,* commercial value quality involved in the right of publicity tort.

---

[22]The right of publicity tort is recognized by statute in Nevada by NRS 598.980-.988.

As said, in the case of a private person, the invasion of privacy resulting from misuse or misappropriation of that person's name or identity is a personal injury, an injury that is redressable by general damages for the mental anguish and embarrassment suffered by reason of the unwanted public use of the private person's name. When, however, the name of a famous or celebrated person is used unauthorizedly, that person's main concern is not with bruised feelings, but rather, with the commercial loss inherent in the use by another of the celebrated name or identity. The commercial or property interest that celebrities have in the use of their names and identities is protected under what has been termed the "right of publicity."

There is a certain reciprocity between the two kinds of interests, personal and proprietary; and, accordingly, the more the aspects of one tort are present, the less likely are the aspects of the other tort to be present. The more obscure the plaintiffs are, the less commercial value their names have and the more such plaintiffs will be seeking to redress *personal* interest in privacy in a common law appropriation action, and not commercial or *property* interests in their name or likeness as a claimed violation of a right of publicity. The more famous and celebrated the plaintiffs, the less injury is likely to be claimed to their privacy interests, their interest in being "left alone," because their names and likenesses already have wide recognition and are not appropriate subjects for invasions of personal privacy. Generally speaking, a private person will be seeking recovery for the appropriation tort, and a celebrity will be recovering for the right of publicity tort. A celebrity, whose identity, by definition, is well known, will not ordinarily be heard to complain of "indignity," mental distress, or other personal injury resulting from the public use of his or her name; and consequently, such a person ordinarily will be suing for invasion of the right of publicity and will not likely be able to prosecute a successful claim under the common law privacy tort, appropriation of name or likeness.

Prosser did not recognize a discrete difference between the two torts that we are now discussing; but as far back as 1953, in the case of Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir. 1953), Judge Jerome Frank commented:

> [I]n addition to and *independent of* that right to privacy [i.e. the appropriation privacy tort] . . . a man has the right in *the publicity value* of his photograph . . . . This right might be called a 'right of publicity.' For it is common knowledge that many prominent persons . . . far from having their feelings bruised through public exposure of their likeness, would feel

sorely deprived if they no longer received money for autho-
rizing advertisements . . . .

(Emphasis added.)

As discussed by Judge Frank in *Haelan,* the right of publicity
refers to a property right in a person's identity. This property
right is infringed by the unpermitted use of a person's identity for
money-making purposes. This infringement on what is in every
sense a property right is, as we have explained, quite different
from the other tort action, the personal injury action involved in
the appropriation privacy tort.

The distinction between the two kinds of torts being discussed
was also put with clarity by Joseph R. Grodin in this way:

[T]he Haelan case gave protection to persons' commercial
interest in their personality independent of their privacy
interest. . . . [C]ourts have confused commercial interests
with privacy interests. . . . *If courts wish to protect both
interests to at least some extent, they should do so under
separate doctrines, so that limitations appropriate to each
interest may be imposed.*

Note, Joseph R. Grodin, *The Right of Publicity: A Doctrinal
Innovation,* 62 Yale L.J. 1123 (1953) (emphasis added), *quoted
in* J. Thomas McCarthy, *The Rights of Publicity and Privacy* §
1.7, page 1-34 (1993). "[T]he act of infringement on the Right of
Publicity can properly be viewed as a commercial 'tort,' as well
as a form of 'unfair competition.' " McCarthy, *supra,* at § 10.02,
page 10-6.

Berosini, a public figure and celebrity, has not sued for viola-
tion of his *right of publicity.* Berosini has prosecuted a common
law *appropriation* tort action in this litigation. Even though he
sues under the appropriation tort, it is apparent from Berosini's
brief that tort damages for hurt feelings stemming from defend-
ants' commission of the appropriation privacy tort is not what he
is really interested in; rather, Berosini is (understandably) only
interested in recovery of the "pecuniary gain sought by PETA
through the use of Berosini's name and likeness . . . ." (Berosini
Brief, p. 76). Berosini claims in his brief that PETA used his
photographs and name "to promote national publicity for PETA
and to raise money as part of the fund raising campaign." *Id.* The
"pecuniary gain" by PETA and its use of Berosini's celebrity for
publicity and fund-raising purposes is not, and cannot be, of the
personal injury kind of tort represented by the appropriation
privacy tort or (as put in Berosini's brief) "within the common

law tort of misappropriation of one's name and likeness.'' If there were a ''privacy'' tort committed here by PETA, it would necessarily have to be a tort involving the right of publicity and *only* the right of publicity, and *not* the hurt-feelings, personal injury tort of appropriation.

Nevada has codified the right of publicity tort in NRS 598.980-.988. Nevada provides a statutory remedy in cases of invasion of the right of publicity and for protection against ''any commercial use within this state of a living or deceased person's name, voice, signature, photograph or likeness . . . .'' NRS 598.982. The statute provides a complete and exclusive remedy for right of publicity torts. Berosini does not plead a right of publicity tort, did not request that the jury be instructed on this statutory tort, and did not argue the commission of this tort in his appeal. Berosini, therefore, cannot recover on the ''common law'' tort, the appropriation privacy tort, for the reasons stated; and he cannot recover under the statutory tort, the right of publicity tort because he has not sought recovery under the statute. The ''privacy'' tort judgments against PETA and Roush must therefore be reversed.

The judgement of the trial court is reversed in its entirety.[23]

STEFFEN and YOUNG, JJ., and LEHMAN, D. J., concur.[24]

---

[23]THE HONORABLE ROBERT E. ROSE, Chief Justice, voluntarily recused himself from participation in the decision of this appeal.

[24]The Honorable Jack Lehman, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE JOHN MOWBRAY, Chief Justice. Nev. Const. art. 6, § 4. THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this appeal.