[No. B109530. Second Dist., Div. Three. Apr. 30, 1999.]

STEPHEN F. WILKINS et al., Plaintiffs and Appellants, v. NATIONAL BROADCASTING COMPANY, INC., et al., Defendants and Respondents.

## COUNSEL

Neville L. Johnson & Associates, Neville L. Johnson; and David A. Elder for Plaintiffs and Appellants.

Anne H. Egerton; Irell & Manella and Henry Shields, Jr., for Defendants and Respondents.

## OPINION

**KITCHING, J.**—This case arises from a 1994 *Dateline NBC* news report that investigated the then growing practice of charging for services on so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services. Many of the 800 lines provided the caller with access to 900-number type adult entertainment lines. SimTel Communications (SimTel) leased and programmed 800 and 900 lines, and then sold them to investors.

In connection with *Dateline NBC*'s investigation, two National Broadcasting Company, Inc., producers responded to SimTel's national advertisement in USA Today for investors, and arranged to meet with a SimTel salesperson. The producers did not reveal their association with *Dateline NBC*. They met with SimTel representatives Stephen F. Wilkins (Wilkins) and Thomas R. Scott (Scott) at a restaurant in Malibu and videotaped the lunch meeting with hidden cameras. Portions of the videotape appeared in a subsequent television broadcast.

Wilkins and Scott asserted claims for intrusion, unlawful recording of confidential communications, fraud, and various other causes of action against the National Broadcasting Company, Inc., and its producers (collectively referred to as NBC). The trial court granted summary judgment in favor of NBC. The trial court also denied Wilkins and Scott's motion for a new trial and assessed discovery sanctions against them and their counsel. Wilkins and Scott appeal.

We find as a matter of law that plaintiffs have not raised triable issues of fact regarding their causes of action for intrusion, violation of Penal Code section 632, fraud, public disclosure of private facts, intentional infliction of emotional distress or negligent infliction of emotional distress. Accordingly, we affirm.

### Factual and Procedural Background

On October 4, 1994, NBC broadcast a report on its program *Dateline NBC* entitled "Hardcore Hustle." The "Hardcore Hustle" report had the first in a three-part *Dateline NBC* series about the "pay-per-call" industry.

In connection with the preparation of the "Hardcore Hustle" report, *Dateline NBC* producer Jack Cloherty (Cloherty) called SimTel, a pay-per-call provider, in response to one of its national newspaper advertisements. He spoke with SimTel salesperson Scott. Scott subsequently spoke on the telephone with a woman whom he later learned to be *Dateline NBC* associate producer Sandra Surles (Surles). Neither Cloherty nor Surles told Scott that they worked for *Dateline NBC*. Surles told Scott that she and Cloherty were coming to California. They arranged to meet to discuss SimTel's business.

A lunch meeting took place at an outside patio table at a restaurant in Malibu. Cloherty and Surles brought two additional people with them to lunch. Scott brought his supervisor, Sales Manager Wilkins. Wilkins had not previously spoken with Cloherty or Surles. Neither Scott nor Wilkins asked about the two additional people that Cloherty and Surles brought with them, nor did they inquire if these two persons were interested in purchasing SimTel's products.

At the lunch meeting, Wilkins explained how SimTel conducted business and how its 800- and 900-number products worked. The parties discussed SimTel's products. NBC videotaped the lunch meeting with hidden cameras. NBC later broadcast brief excerpts of the videotape footage in its "Hardcore Hustle" report.

On August 1, 1995, SimTel, Wilkins, and Scott filed a complaint against NBC, KNBC-TV, Jane Pauley, Lea Thompson, Cloherty, Cindy Kuhn and Geoffrey's Malibu.[1] They alleged causes of action for (1) physical intrusion on solitude or into private affairs (intrusion); (2) fraud and conspiracy to commit fraud; (3) conspiracy to commit and intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) unlawful eavesdropping on or recording of confidential communications (Pen. Code, §§ 632, subd. (a), 634, 637.2); (6) public disclosure of private facts; (7) violation of right of privacy (Cal. Const., art. I, § 1); (8) trade libel and conspiracy to commit the same; (9) conspiracy to interfere with and interference with prospective economic advantage and contractual relations; (10) unfair business practices;[2] and (11) conspiracy to commit and defamation; (12) false light and intention to commit false light.[3] The gravamen of the complaint was that NBC's secret videotape of Wilkins and Scott constituted an unwarranted invasion of their privacy.

On October 4, 1996, Wilkins and Scott moved for summary adjudication on the second cause of action for fraud. On October 4, 1996, NBC moved for summary judgment on Wilkins and Scott's complaint. The trial court denied Wilkins and Scott's motion and granted NBC's motion.[4]

Judgment was entered on November 14, 1996. On December 27, 1996, the trial court denied Wilkins and Scott's motion for a new trial.

Wilkins and Scott timely filed a notice of appeal.

---

[1]SimTel dismissed all of its claims with prejudice on or about July 16, 1996. Wilkins and Scott dismissed Geoffrey's from the complaint on May 23, 1996.

[2]This cause of action was never litigated by Scott and Wilkins.

[3]The causes of action for violation of right of privacy (7th cause of action), conspiracy to commit and defamation (11th cause of action), and false light and intention to commit false light (12th cause of action) were dismissed on September 19, 1996. The causes of action for trade libel and conspiracy to commit same (8th cause of action) and conspiracy to interfere with and interference with prospective economic advantage (9th cause of action) were solely SimTel's causes of action.

[4]In a minute order the trial court stated, in relevant part: "Assuming that plaintiffs are correct in their contention that the fact that a meeting is at a restaurant does not, as a matter of law, preclude a reasonable expectation of privacy, the videotapes show that plaintiffs could not entertain any such reasonable expectation in this case. They made no effort to obtain the affiliation or reason for attendance of two of the persons present and continued to speak freely while employees of the restaurant were at the table and could hear what was said. This defect is fatal to all of the claims asserted by plaintiffs in their complaint."

## DISCUSSION

### 1. *Summary Judgment Was Properly Granted in Favor of NBC*

#### a. *Standard of Review*

■ Summary judgment is granted when a moving party establishes the right to entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Hunter* v. *Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1285 [44 Cal.Rptr.2d 335].) "Review of summary judgment . . . 'involves pure matters of law,' which we review independently. [Citations.]" (*Radovich* v. *Locke-Paddon* (1995) 35 Cal.App.4th 946, 953 [41 Cal.Rptr.2d 573].) In conducting this de novo review, "we will consider only the facts properly before the trial court at the time it ruled on the motion. [Citation.]" (*Brantley* v. *Pisaro* (1996) 42 Cal.App.4th 1591, 1601 [50 Cal.Rptr.2d 431].)

"As a summary judgment motion raises only issues of law regarding the construction and effect of supporting and opposing papers, this court independently applies the same three-step analysis required of the trial court. We identify issues framed by the pleadings; determine whether the moving party's showing established facts that negate the opponent's claim and justify a judgment in the moving party's favor; and if it does, we finally determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]" (*Tsemetzin* v. *Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1342 [67 Cal.Rptr.2d 726].)

■ "Under the current version of the summary judgment statute, a moving defendant need not support his [or her] motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may (through factually vague discovery responses or otherwise) point to *the absence of evidence to support the plaintiff's case*. When that is done, the burden shifts to the plaintiff to present evidence showing there is a triable issue of material fact. If the plaintiff is unable to meet [his or] her burden of proof regarding an essential element of [his or] her case, all other facts are rendered immaterial. [Citations.]" (*Leslie G.* v. *Perry & Associates* (1996) 43 Cal.App.4th 472, 482 [50 Cal.Rptr.2d 785], italics in original.)

■ " '[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy [in such cases] . . . .' [Citations.] Nonetheless, the basic question raised on a defense motion for summary judgment, and on review of such judgment, is the same in a privacy action against media defendants as in other cases: Does the motion record demonstrate the

existence of triable issues of fact, or was the defense entitled to judgment as a matter of law?" (*Shulman* v. *Group W Productions, Inc.* (1998) 18 Cal.4th 200, 228 [74 Cal.Rptr.2d 843, 955 P.2d 469].)

### b. *Tort of Intrusion*

Wilkins and Scott contend that NBC invaded their privacy by intrusion into their solitude, seclusion or private affairs by videotaping them at the lunch meeting. We disagree.

Our Supreme Court in *Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at pages 230-232, has recently discussed the tort of intrusion as follows: "Of the four privacy torts identified by Prosser, the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of an 'invasion of privacy.' It encompasses unconsented-to physical intrusion into the home, hospital room or other place the privacy of which is legally recognized, as well as unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying. [Citation.] It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity. . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"[T]he action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. . . . [¶] . . . To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surroundings, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source. [Citations.]"

The Restatement Second of Torts section 652B states that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

Furthermore, "[w]hile what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion. [¶] . . . [¶] . . . A court determining the existence of 'offensiveness' would consider

the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." (*Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1483-1484 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027].)

Three cases have applied the California rules to specific facts. They have determined that there is an expectation of privacy in one's home, or in other places when circumstances create an expectation of privacy.

In *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245, two Life magazine reporters surreptitiously gained entrance to Mr. Dietemann's home under the guise of seeking medical treatment. (*Id.* at p. 246.) They were preparing an article entitled Crackdown on Quackery. (*Id.* at p. 245.) The reporters, in Mr. Dietemann's den, used hidden camera and audio equipment to record the treatments that were accomplished with the use of " 'equipment which could at best be described as gadgets.' " (*Id.* at p. 246.) The pictures appeared in Life's magazine article. (*Id.* at pp. 245-247.) Dietemann was arrested for practicing medicine without a license. (*Id.* at p. 246.) Dietemann sued for, inter alia, invasion of privacy. (*Id.* at p. 247.) .

The *Dietemann* court concluded "that clandestine photography of the plaintiff in his den and the recordation and transmission of his conversation without his consent resulting in his emotional distress warrants recovery for invasion of privacy in California." (*Dietemann* v. *Time, Inc., supra,* 449 F.2d at p. 248.) The court noted that "[c]oncurrently with the development of privacy law, California had decided a series of cases according plaintiffs relief from unreasonable penetrations of their mental tranquility based upon the tort of intentional infl[i]ction of emotional distress . . . . [¶] We are convinced that California will 'approve the extension of the tort of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man in plaintiff's position could reasonably expect that the particular defendant should be excluded.' [Citation.]" (*Id.* at pp. 248-249.)

Dietemann performed his alleged quack healing in his home. He did not advertise his services or charge for them. (*Dietemann* v. *Time, Inc., supra,* 449 F.2d at p. 246.) The *Dietemann* court determined that "[p]laintiff's den was a sphere from which he could reasonably expect to exclude eavesdropping newsmen. He invited two of defendant's employees to the den. One who invites another to his home or office takes a risk that the visitor may not be what he seems, and that the visitor may repeat all he hears and observes

when he leaves. But he does not and should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording, or in our modern world, in full living color and hi-fi to the public at large or to any segment of it that the visitor may select." (*Id.* at p. 249.)

In *Miller* v. *National Broadcasting Co., supra,* 187 Cal.App.3d 1463, ". . . an NBC television camera crew entered the apartment of Dave and Brownie Miller in Los Angeles, without their consent, to film the activities of Los Angeles Fire Department paramedics called to the Miller home to administer life-saving techniques to Dave Miller, who had suffered a heart attack in his bedroom. The NBC television camera crew not only filmed the paramedics' attempts to assist Miller, but NBC used the film on its nightly news without obtaining anyone's consent." (*Id.* at p. 1469.) Additionally, ". . . NBC later used portions of the film in a commercial advertising an NBC 'mini-documentary' about the paramedics' work." (*Ibid.*) Brownie Miller sued, inter alia, for invasion of privacy. (*Id.* at p. 1470.)

The *Miller* court determined that "reasonable people could regard the NBC camera crew's intrusion into Dave Miller's bedroom at a time of vulnerability and confusion occasioned by his seizure as 'highly offensive' conduct, thus meeting the limitation on a privacy cause of action Restatement of Torts, section 652B imposes." (*Miller* v. *National Broadcasting Co., supra,* 187 Cal.App.3d at p. 1484.) The court concluded that ". . . the NBC camera crew, the uninvited media guests, not only invaded the Millers' bedroom without Dave Miller's consent, they also invaded the home and [the] privacy of [the] plaintiff['s] wife . . . ." (*Id.* at p. 1486.) Furthermore, *Miller* concluded NBC had no right to be in any part of Brownie Miller's home without her consent. (*Ibid.*)

In *Shulman* v. *Group W Productions, Inc., supra,* 18 Cal.4th 200, a flight nurse employed by a helicopter rescue company wore a microphone during her evaluation and treatment of the Shulmans, two car accident victims. (*Id.* at p. 210.) The nurse also permitted a television photographer to accompany her to the scene of the accident and to photograph the Shulmans, both at the scene of the accident and in the rescue helicopter as it transported them to the hospital. (*Id.* at pp. 210-211.) The microphone recorded the nurse's conversations with Mrs. Shulman, and the television production company later included those recordings in its broadcast. (*Ibid.*)

The *Shulman* court held that the cameraman's "mere presence at the accident scene and filming of the events occurring there [could not] be deemed either a physical or sensory intrusion on plaintiff's seclusion[,

because the Shulmans] had no right of ownership or possession of the property where the rescue took place [an interstate highway], nor any actual control of the premises." (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 232.) The court further concluded, however, that the plaintiffs might be entitled to recover for intrusion based on (1) the videotaping by the television camera operator "in the interior of the rescue helicopter, which served as ambulance," and (2) the audiotaping of the conversations between Mrs. Shulman and the flight nurse "and other medical rescuers at the accident scene." (*Id.* at pp. 232-233.) The court noted that "[a] patient's conversation with a provider of medical care in the course of treatment, including emergency treatment, carries a traditional and legally well-established expectation of privacy." (*Id.* at p. 234.)

(1) *There Was No Intrusion Into a Private Place, Conversation or Matter*

■ Wilkins and Scott were secretly videotaped while they conducted a business meeting on the outdoor patio of a public restaurant. They met with Cloherty and Surles, and two other individuals, to discuss SimTel's products. Wilkins spoke freely about the programs, even with the addition of these two "strangers," and while waiters stood at the table. The sales pitch was conducted in the middle of a crowded patio within close proximity to other tables. The location was not secluded and neither Wilkins nor Scott conducted himselves as though they were dispensing private information. Wilkins and Scott admitted in their depositions that they freely provided the same information about SimTel's products to hundreds of other potential investors, that they never asked about the two additional people at the table, and that Cloherty and Surles could have brought as many people to lunch as they wished. There was no physical or sensory intrusion into their privacy. Wilkins and Scott were not seated in a private dining room of a restaurant. Rather, they discussed business matters on the open patio of a public restaurant with four strangers. There was no entry by NBC into their homes, or even their offices (where Scott frequently entertained prospective clients). Nor did NBC intrude into the personal lives, intimate relationships, or any other private affairs of Wilkins or Scott. Instead, NBC photographed the two men in a public place and taped their conversations which were about business, not personal matters. There was no intrusion into a private place, conversation or matter. (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 231.)

(2) *NBC's Actions Were Not Highly Offensive to a Reasonable Person*

For the reasons which we have already discussed, we find as a matter of law that NBC's actions were not highly offensive to a reasonable person. (*Shulman* v. *Group W Productions, Inc., supra,* 18 Cal.4th at p. 231.)

(3) *Wilkins and Scott Had No Objectively Reasonable Expectation of Seclusion or Solitude in the Public Restaurant.*

Whether Wilkins or Scott had a reasonable expectation of privacy in their business discussion with Cloherty, Surles, and the two strangers, must be judged by an objective standard. (*Shulman* v. *Group W Productions, Inc., supra,* 18 Cal.4th at p. 232.) Pursuant to our review of the videotape and consideration of the admissions of Wilkins and Scott, we conclude that Wilkins and Scott had no objective expectation of privacy in their business lunch meeting.

Wilkins and Scott cannot maintain an action for invasion of privacy, to wit, the tort of intrusion.

c. *Penal Code Section 632*

Wilkins and Scott contend that by videotaping the lunch meeting at the restaurant, the *Dateline NBC* producers violated the California Penal Code's prohibition against eavesdropping on or recording confidential communications. We disagree.

Penal Code section 632 bars the intentional recording of a "confidential communication" without the consent of all parties to the communication.[5] Penal Code section 637.2, subdivision (a) permits a civil action against a person who violates the statute. It is an essential element of a Penal Code section 632, subdivision (a) claim that Scott and Wilkins prove that the conversation that was taped was "confidential." Penal Code section 632, subdivision (c) defines the term "confidential communication" as a "communication carried on in circumstances as may reasonably indicate that any

---

[5]Penal Code section 632, subdivision (a) provides that: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among [such] parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding . . . ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."

party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering . . . or in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

"Application of the statutory definition of 'confidential communication' turns on the reasonable expectations of the parties judged by an objective standard and not by the subjective assumptions of the parties." (*O'Laskey* v. *Sortino* (1990) 224 Cal.App.3d 241, 248 [273 Cal.Rptr. 674].) "The test of confidentiality is objective." (*Coulter* v. *Bank of America* (1994) 28 Cal.App.4th 923, 929 [33 Cal.Rptr.2d 766].)

Wilkins and Scott argue that the conversation at the lunch meeting was confidential because they assumed the communications would not be discussed with any other parties. However, Wilkins testified in his deposition that he did not say anything he thought was a secret, that he did not say anything he had not said to another potential investor, and that he had not told anyone that the information he provided about SimTel was private and should not be passed on to others. Wilkins did not tell potential investors that they could not pass on this information.

On the facts of this case, Wilkins and Scott cannot make the showing required under *O'Laskey* and *Coulter*. Cloherty and Surles were virtual strangers to Wilkins and Scott, and the two people who accompanied them were total strangers, about whom Wilkins and Scott never inquired. Moreover, the topic of the lunch was SimTel's business and Wilkins gave a sales pitch he had given to many others. Waiters frequently came to the table, but Wilkins did not acknowledge them, pause in his sales pitch, or even lower his voice. Indeed, Wilkins admitted at his deposition that the sales discussion contained no secrets. Scott admitted at his deposition that Cloherty and Surles could have brought with them to lunch as many people as they liked. No trier of fact could find, judged by an objective standard, that Wilkins and Scott reasonably expected that their conversation would not be divulged to anyone else. Penal Code section 632 prohibits the recording only of "confidential" conversations. This conversation was not confidential under the terms of the statute and *O'Laskey* and *Coulter*. Accordingly, videotaping the lunch meeting did not violate Penal Code section 632.

### d. *Fraud*

Scott and Wilkins contend that the *NBC Dateline* producers committed fraud under three alternative theories. First, they argue that Cloherty and Surles made affirmative misrepresentations to them on which they relied as

follows: Cloherty's last name was Fullerty, Cloherty and Surles were married to each other, Cloherty and Surles were potential investors, and the two people they brought to lunch were their friends. Second, they contend Cloherty and Surles made material omissions and were legally obligated to disclose that they were journalists, that SimTel was the subject of an investigation, and that NBC was videotaping them at the lunch meeting. Third, they argue NBC committed deceptive acts in connection with a contract and is liable to Scott and Wilkins under Civil Code section 1572.

(1) *Alleged Affirmative Misrepresentations—No Justifiable Reliance*

■ Under California law, a cause of action for fraud requires the plaintiff to prove (a) a knowingly false misrepresentation by the defendant, (b) made with the intent to deceive or to induce reliance by the plaintiff, (c) justifiable reliance by the plaintiff, and (d) resulting damages. (*Service by Medallion, Inc.* v. *Clorox Co.* (1996) 44 Cal.App.4th 1807, 1816 [52 Cal.Rptr.2d 650].)

Even if Wilkins and Scott had evidence of misrepresentations made by the producers of *NBC Dateline*, they are unable to prove they relied to their detriment on such misrepresentations. Even assuming Wilkins and Scott believed Cloherty and Surles were potential investors, they were not induced to provide any information about SimTel because of any supposed representations by NBC. Wilkins admitted in his deposition that he would have answered Cloherty and Surles's questions even if he had known they were reporters, and that "the gist of what [he] was saying would have been exactly the same," but that he "might have worded" some of his remarks a little differently. Scott admitted he would not have done anything differently if he had known Cloherty's true name and that he and Surles were not married. Scott admitted at his deposition that it was his job to dispense information packets about SimTel freely upon request. Wilkins testified that SimTel entered into contracts with only about 3 percent of people who made actual inquiries. Ninety-seven percent of those who called SimTel and received information about its business never leased an 800 line. Scott admitted that Cloherty and Surles could have brought as many people to the meeting as they wished. Wilkins and Scott did not ask Cloherty and Surles to identify their "friends" and they did not care whether they were interested in SimTel's business.

After the depositions, Wilkins and Scott submitted declarations in opposition to the motion for summary judgment in which they stated that

Cloherty and Surles had "indicated they were on vacation in California and a married couple" and that they "never would have had a conversation with the defendants if [they] had known they were spies for NBC . . . ." ■ California courts, however, do not permit a party to defeat summary judgment by contradicting in a declaration that party's previous deposition testimony. On a motion for summary judgment, "the credibility of the [deposition] admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive." (*Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 382 [121 Cal.Rptr. 768]; see also *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22 [112 Cal.Rptr. 786, 520 P.2d 10].)

### (2) *Alleged Material Omissions—Duty to Disclose*

■ Wilkins and Scott contend that NBC was required to advise them they were the subject of an investigation, that the people they were meeting were really journalists, that the "investors" they were meeting had hidden cameras, that the two "friends" were associated with the investigation, and that the meeting would be broadcast as part of a television newsmagazine. We disagree.

■ "There are 'four circumstances in which nondisclosure or conceal-ment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclu-sive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some mate-rial facts. [Citation.]' " Putting aside a fiduciary relationship, "[e]ach of the other three circumstances in which nondisclosure may be actionable presup-poses the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise. . . . [¶] . . . [S]uch a relationship can only come into being as a result of some sort of transaction between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agree-ment. [Citation.] All of these relationships are created by transactions be-tween parties from which a duty to disclose facts material to the transaction arises under certain circumstances." (*LiMandri* v. *Judkins* (1997) 52 Cal.App.4th 326, 336-337 [60 Cal.Rptr.2d 539], italics & fn. omitted.)

In *Deteresa* v. *American Broadcasting Companies, Inc.* (9th Cir. 1997) 121 F.3d 460, a case analogous to the case at bar, the Ninth Circuit relied on the

*LiMandri* case to affirm a judgment for the American Broadcasting Company. In *Deteresa*, plaintiff filed a lawsuit against the American Broadcasting Company and producer Anthony Radziwill for, inter alia, fraud and conspiracy to commit fraud. (*Id.* at p. 462.) Radziwill attempted to convince plaintiff, a flight attendant on the flight O.J. Simpson took from Los Angeles to Chicago, to appear on a television show to discuss the flight. (*Ibid.*) Plaintiff and Radziwill talked, but she said no. The next day, Radziwill again attempted to arrange for plaintiff to appear on television. (*Ibid.*) When plaintiff again said no, Radziwill revealed that he had audiotaped and videotaped their conversation from the previous day.

The plaintiff's claim alleged "that ABC and Radziwill committed fraud and conspiracy to commit fraud by failing to disclose that Radziwill was audiotaping and videotaping her." (*Deteresa* v. *American Broadcasting Companies, Inc., supra,* 121 F.3d at p. 467.)

The Ninth Circuit stated: "The district court concluded that ABC was entitled to summary judgment on Deteresa's fraud claim because she presented no evidence that she and Radziwill shared the requisite relationship for Radziwill to have a duty to disclose that he was taping her. We agree. Deteresa has presented no evidence that she and Radziwill shared any such relationship." (*Deteresa* v. *American Broadcasting Companies, Inc., supra,* 121 F.3d at p. 467.)

 Similarly, Wilkins and Scott have presented no evidence that they and Cloherty and Surles shared the requisite relationship which would impose upon the *NBC Dateline* producers a duty to disclose the use of hidden cameras. (*Deteresa* v. *American Broadcasting Companies, Inc., supra,* 121 F.3d at p. 467; *LiMandri* v. *Judkins, supra,* 52 Cal.App.4th at pp. 336-337.) In addition, the videotape and the admissions of Wilkins and Scott show that they willingly presented their business pitch to anyone who was interested. Thus, the fact that Cloherty and Surles were reporters, that they had hidden cameras, that the identity of the two "friends" was not disclosed, and that the meeting would be broadcast were not "facts material to the transaction." (See *id.* at p. 337.)

(3) *Civil Code Section 1572*

Wilkins and Scott also rely on Civil Code section 1572. However, that code section applies only to fraud "committed by a party to the *contract . . .* with intent to deceive another party thereto, or to induce him to enter into the

contract." (Italics added.) Since there was no contract between Wilkins and Scott and NBC, they have no cause of action under Civil Code section 1572.

### e. Public Disclosure of Private Facts

Scott and Wilkins contend that their "occupations . . . as salesmen for SimTel," their names, likenesses and voices were private facts that were not matters of public concern. We disagree.

Our Supreme Court in *Shulman* has set forth the requirements for the tort of public disclosure. They are: " '(1) public disclosure[,] (2) of a private fact[,] (3) which would be offensive and objectionable to the reasonable person[,] and (4) which is not of legitimate public concern.' [Citations.]" (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 214.)

"The element critical to [a public disclosure of private facts] case is the presence or absence of legitimate public interest, i.e., newsworthiness, in the facts disclosed. After reviewing the decisional law regarding newsworthiness, we conclude, inter alia, that lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability. We further conclude that the analysis of newsworthiness inevitably involves accommodating conflicting interests in personal privacy and in press freedom as guaranteed by the First Amendment to the United States Constitution, and that in the circumstances of this case—where the facts disclosed about a private person involuntarily caught up in events of public interest bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance—the broadcast was of legitimate public concern, barring liability under the private facts tort. [¶] . . . [¶] [T]he dissemination of truthful, newsworthy material is not actionable as a publication of private facts." (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at pp. 214-215.)

In the *Shulman* case, the court stated ". . . the subject matter of the broadcast as a whole was of legitimate public concern. Automobile accidents are by their nature of interest to that great portion of the public that travels frequently by automobile. The rescue and medical treatment of accident victims is also of legitimate concern to much of the public, involving as it does a critical service that any member of the public may someday need. The story of [the accident victim's] difficult extrication from the crushed car, the medical attention given her at the scene, and her evacuation by helicopter was of particular interest because it highlighted some of the challenges

facing emergency workers dealing with serious accidents." (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 228.)

The court stated the more difficult question was "whether [the victim's] appearance and words as she was extricated from the overturned car, placed in the helicopter and transported to the hospital were of legitimate public concern" and concluded that "the disputed material was newsworthy as a matter of law." (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 228.) The court determined that the flight nurse's work was shown as demanding and important, and the emergency care required "not only medical knowledge, concentration and courage, but an ability to talk and listen to severely traumatized patients. One of the challenges [the flight nurse] face[d] in assisting [the accident victim was] the confusion, pain and fear that [the accident victim] understandably [felt] in the aftermath of the accident. For that reason the broadcast video depicting [the accident victim's] injured physical state . . . and audio showing her disorientation and despair were substantially relevant to the segment's newsworthy subject matter." (*Id.* at p. 229.)

In the *Shulman* case, the plaintiffs argued that showing the victim's " 'intimate private, medical facts and her suffering was not necessary to enable the public to understand the significance of the accident or the rescue as a public event.' " (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 229, italics omitted.) The court stated that "[t]he standard . . . is not necessity. That the broadcast could have been edited to exclude some of [the victim's] words and images and still excite a minimum degree of viewer interest is not determinative. Nor is the possibility that the members of [the Supreme Court] or another court, or a jury, might find a differently edited broadcast more to their taste or even more interesting. The courts do not, and constitutionally could not, sit as superior editors of the press." (*Ibid.*)

In addition, the challenged material "did not constitute a 'morbid and sensational prying into private lives *for its own sake*.' " (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 229, original italics.)

As explained in *Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at page 230: "It is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact. As broadcast, the segment included neither [the victim's] full name nor direct display of

her face. She was nonetheless arguably identifiable by her first name (used in recorded dialogue), her voice, her general appearance and the recounted circumstances of the accident (which, as noted, had previously been published, with [the victim's] full name and city of residence, in a newspaper). In a video documentary of this type, however, the use of that degree of truthful detail would seem not only relevant, but essential to the narrative." (Fn. omitted.)

In our case we consider whether the alleged private facts Wilkins and Scott complained of—the use of their names, likenesses, and voices, and the fact they worked at SimTel—was of a legitimate public interest. The broadcast investigated the growing practice of charging for so-called "toll-free" 800 lines, often without the knowledge of the person billed for the services. Many of the 800 lines provided the caller with access to 900-number type adult entertainment lines without the caller's knowledge. SimTel leased and programmed 800 and 900 lines, and then sold them to investors. The first part of the *Dateline NBC* broadcast provided a description of the firms and the persons who provided these phone lines and explained how the operation worked. The broadcast demonstrated that legislators, regulators, and law enforcement persons expressed grave concerns about the 800-number loophole in the statute regulating 900 numbers, and the ability of pay-per-call providers like SimTel to profit from calls made by unsuspecting people believing that they were free.

We find the use of Wilkins and Scott's names, likenesses, voices, and occupations were of legitimate public concern and did not constitute a " 'morbid and sensational prying into private lives for its own sake.' " (*Shulman* v. *Group W Productions, Inc., supra*, 18 Cal.4th at p. 229, italics omitted.)

Information about an enterprise which potentially affected unsuspecting callers was of legitimate public interest. The use of Wilkins and Scott's names, likenesses, voices and occupations added authenticity to the broadcast. It showed who was making the presentation, what they were saying, and how they were saying it. The broadcast showed the verbal and nonverbal communication of the salesmen as they were making their presentation. It turned an abstract story into something the public could more readily understand by making it more concrete.

Here, the broadcast material was not so "lurid and sensational in emotional tone, or so intensely personal in content, as to make its intrusiveness

disproportionate to its relevance." (*Shulman* v. *Group W Productions, Inc.,* supra,* 18 Cal.4th at p. 229.) It served a "legitimate descriptive and narrative" purpose. We find the disputed material newsworthy as a matter of law. Thus, Wilkins and Scott cannot recover for the tort of public disclosure of private facts.

### f. *Intentional Infliction of Emotional Distress*

" 'The elements of a prima facie case for the tort of intentional infliction of emotional distress [are] . . . as follows: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' [Citation.]" (*Miller* v. *National Broadcasting Co., supra,* 187 Cal.App.3d at p. 1487.)

We have already determined that the act of filming a business lunch in a public place constituted neither an intrusion on Wilkins and Scott's privacy, a violation of Penal Code section 632, fraud, or public disclosure of private facts. Based on that determination and the facts of this case, as a matter of law, we find this conduct is not so extreme and outrageous "as to exceed all bounds of that usually tolerated in a civilized society." (*Trerice* v. *Blue Cross of California* (1989) 209 Cal.App.3d 878, 883 [257 Cal.Rptr. 338].) This tort claim must also fail.

### g. *Negligent Infliction of Emotional Distress*

Wilkins and Scott's negligence claim is based on the premise that NBC had a duty to tell them they were being filmed. We have already determined that Wilkins and Scott have not shown that any legal duty to disclose ever arose. As a matter of law, and in the absence of any duty, this claim must fail.

### 2. *New Trial Motion and Discovery Sanctions*

Without any legal authority or argument, Wilkins and Scott contend the trial court should have granted their new trial motion based on newly discovered evidence and should not have granted discovery sanctions for refusal to answer questions or appear at depositions.

These arguments have been waived. ▮ " 'In a challenge to a judgment, it is incumbent upon an appellant to present argument and authority on each point made. Arguments not presented will generally not receive consideration.' [Citation.]" (*In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 278 [268 Cal.Rptr. 83].)

### DISPOSITION

Judgment is affirmed. NBC is awarded costs on appeal.

Croskey, Acting P. J., and Aldrich, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 21, 1999.