MEDICAL LABORATORY MANAGEMENT CONSULTANTS, a corporation dba Consultants Medical Lab; John Devaraj, an individual; Carolyn Devaraj, an individual, Plaintiffs–Appellants,

v.

AMERICAN BROADCASTING COMPANIES, INC.; Diane Sawyer, an individual; Ira Rosen, an individual; Robbie Gordon, an individual; Mark Lukazsiewicz, [sic], an individual; David Shapinsky, an individual; Rhondi Charleston, an individual; Richard Wald, an individual; Phyllis E. McGrady, an individual; and Lori Garcia Cottrell, an individual, Defendants–Appellees.

---

No. 00–15594.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 2002.

Filed Sept. 20, 2002.

Neville L. Johnson, Brian A. Rishwain, Johnson & Rishwain, LLP, Los Angeles, CA, for the plaintiffs-appellants.

Andrew D. Hurwitz, Diane M. Johnsen, Osborn Maledon, P.A., Phoenix, AZ, for the defendants-appellees.

Before HUG, CUDAHY,[*] and TASHIMA, Circuit Judges.

## OPINION

HUG, Circuit Judge.

Medical Laboratory Management Consultants ("Medical Lab") and John Devaraj ("Devaraj"), a founder and owner of Medical Lab, (collectively "Plaintiffs") brought this action against American Broadcasting Companies ("ABC") and individuals allegedly involved in producing the segment *Rush to Read* for ABC's television program *PrimeTime Live* (collectively "Defendants"). The district court, exercising diversity jurisdiction under 28 U.S.C. § 1332, granted summary judgment in Defendants' favor on Devaraj's claim of intrusion upon his seclusion, Medical Lab's claims of trespass and tortious interference with contractual relations and prospective economic relations, and Plaintiffs' claims for punitive damages. Plaintiffs now appeal the district court's resolution of these claims. We have jurisdiction under 28 U.S.C. § 1291 over Plaintiffs' timely appeal of the district court's judgment, which the court entered pursuant to Federal Rule of Civil Procedure 54(b). For the reasons set forth below, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

This action arises out of the videotaping and broadcast of a television segment enti-

---

[*] Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

tled *Rush To Read* for ABC's television program *PrimeTime Live*, which uses undercover, investigative journalists to present "inside" stories of a sensational nature. *Rush To Read* focused on medical laboratories that analyze women's pap smears, highlighting what it perceived to be the pressures that such laboratories place on cytotechnologists [1] to process pap smear slides quickly, and the resulting frequency of testing errors by such laboratories. The television segment reported the results of a study in which four laboratories, including Medical Lab, were each asked to analyze 623 pap smear slides. According to *Rush To Read*, Medical Lab, which was not singled out by name, but referred to only as a "lab in Arizona," failed to identify cervical cancer on several of the slides. The television segment stated that, when told of the study results, Devaraj, whom the segment did not name, but referred to only as the manager of the Arizona laboratory, said that "if mistakes were made it was an unusual circumstance, and he vowed not to take on such a large case load again." *Rush To Read* was 27 minutes in length, two minutes of which discussed Medical Lab as a "lab in Arizona," and 52 seconds of which used videotape taken inside Medical Lab. The videotape showed Devaraj seated, stating that the cytotechnologists that work at Medical Lab also work at other laboratories.

To obtain this content for *Rush To Read*, ABC producer Rhondi Charleston ("Charleston"), posing as a representative of a fictitious Michigan women's health clinic, contacted Medical Lab and arranged to have the 623 slides processed over a weekend. Another ABC producer, Robbie Gordon ("Gordon"), telephoned Devaraj to arrange a meeting at Medical Lab on the day that the slides were scheduled to ar-

rive there. Gordon, who had no prior contact with Medical Lab, represented that she was a cytotechnologist from Georgia who wanted to start a pap smear laboratory. Gordon stated that she would be in Phoenix in a few weeks to visit friends or relatives, and asked whether she might visit Medical Lab to learn more about the pap smear testing industry. Devaraj asked Gordon a few questions, such as "Who are you?" and "Do you have enough funds available?," after which he agreed to schedule a meeting because he thought that she might be able to provide Medical Lab with some business.

On the day of the meeting, Gordon arrived with Jeff Cooke ("Cooke"), who claimed that he was a computer expert, but really was an undercover camera specialist, and with another ABC representative, who stated that she was an administrator or business manager.[2] With hidden cameras located in his wig, Cooke filmed the entire visit to Medical Lab.

The three ABC representatives entered Medical Lab through an unlocked door that led into a reception room. Devaraj invited them to, and they were escorted to, a conference room in Medical Lab's administrative offices. These offices adjoin the laboratory portion of Medical Lab, which is the portion open to the public that serves patients needing blood tests or other laboratory work done. The conference room had windowed French doors that were shut for the duration of the meeting. Devaraj testified that he typically used the conference room only for private conversation and meetings of a confidential nature. Devaraj and the three ABC representatives spoke generally about the pap smear testing industry, about Medical Lab, and about Gordon's supposed plans to open her

---

1. Cytotechnologists are lab technicians that analyze pap smear slides.

2. The record does not disclose the name of this third ABC representative.

own laboratory. Devaraj did not reveal any personal information about himself, and at no point did Devaraj request that any of the matters discussed be kept confidential. Devaraj then invited the ABC representatives on a tour of Medical Lab, an invitation that Devaraj occasionally made to prospective customers, physicians, and other authorized persons. Medical Lab employees were present for portions of the conversation during the tour.

Over the weekend that Medical·Lab processed the 623 pap smear slides, ABC parked a van in the Medical Lab parking lot in order to videotape cytotechnologists as they entered and left the building. ABC stationed the van there to determine whether Medical Lab was complying with federal law, which bars· cytotechnologists from reading more than 100 pap smears in eight hours, and prorates the 100–slide ceiling for shorter work days. *See* 42 C.F.R. § 493.1257(b).

After *Rush To Read* aired on May 19, 1994 and again on or about September 1, 1994, Devaraj, his wife, and Medical Lab filed suit in Arizona superior court against ABC, KTVK–TV, the Phoenix television station that showed *Rush To Read,* and several individuals, including Charleston and Gordon, that allegedly were involved in producing *Rush To Read. Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.,* 931 F.Supp. 1487, 1490 (D.Ariz.1996) (*"Med.Lab.I"*). The defendants removed the action to federal court on the basis of diversity of citizenship, and moved to dismiss a number of the complaint's claims. *Id.* The district court dismissed all of the claims against KTVK–TV, the invasion of privacy claims asserted by Medical Lab and Devaraj's wife, as well as claims of public disclosure of private facts, conspiracy, intentional and negligent infliction of emotional distress, trade libel, and unfair business practices. *Id.* at 1491–94.

Devaraj and Medical Lab then filed a first amended complaint, alleging intrusion upon seclusion, fraud, tortious interference with contractual relations and prospective economic relations, trespass, defamation, false light invasion of privacy, and violation of the federal eavesdropping statute. Plaintiffs later voluntarily dismissed the defamation and false light invasion of privacy claims. Defendants moved for summary judgment on all of the remaining claims and on all punitive damages claims. *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.,* 30 F.Supp.2d 1182, 1186 (D.Ariz.1998) (*"Med.Lab.II"*). Plaintiffs cross-moved for partial summary judgment on the fraud claim. *Id.* at 1201. The district court granted Defendants' summary judgment motion on all claims but the fraud claim, which the court granted in part and denied in part. *Id.* at 1209. The court denied Plaintiffs' motion for partial summary judgment on the fraud claim. *Id.* Pursuant to Federal Rule of Civil Procedure 54(b), the district court entered final judgment for Defendants on all claims but the fraud claim. Plaintiffs subsequently dismissed their fraud claim voluntarily without prejudice. Plaintiffs now appeal the district court's grant of summary judgment on Devaraj's claim of intrusion upon his seclusion, Medical Lab's claims of trespass and tortious interference with contractual relations and prospective economic relations, and their claims for punitive damages.

## ANALYSIS

■ We review *de novo* the district court's grant of summary judgment. *Delta Savings Bank v. United States,* 265 F.3d 1017, 1021 (9th Cir.2001). We must determine, viewing the evidence in the light most favorable to Plaintiffs, the non-moving parties, whether any genuine issues of material fact exist, and whether the

district court correctly applied the relevant substantive law. *Id.* Because this action was removed to federal district court under diversity jurisdiction, we apply the substantive law of Arizona, the forum state. *Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 624 (9th Cir.1996). We note initially that the Arizona courts have not yet had the opportunity to apply Arizona law to circumstances like those presented by this case. "When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n. 7 (9th Cir.2000) (quoting *Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993)). "[W]e must use our best judgment to predict how that court would decide it." *Capital Dev. Co. v. Port of Astoria*, 109 F.3d 516, 519 (9th Cir.1997) (quoting *Allen v. City of Los Angeles*, 92 F.3d 842, 847 (9th Cir.1996)).

## I. *Intrusion Upon Seclusion.*

Devaraj asserts that Defendants' covert videotaping of his conversation with the three undercover ABC representatives during their visit to Medical Lab is actionable under the tort of intrusion upon seclusion. The Arizona Supreme Court has recognized the invasion of privacy torts laid out in the Restatement (Second) of Torts §§ 652A et seq., which include the tort of intrusion upon seclusion, *see Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 783 P.2d 781, 788 (1989), and at least one Arizona Court of Appeals decision has applied the tort of intrusion upon seclusion. *See Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 947 P.2d 846, 853–54 (Ct. App.1997). The Arizona courts generally follow the Restatement in the absence of Arizona authority on an issue. *Reed v.*

*Real Detective Publ'g. Co.*, 63 Ariz. 294, 162 P.2d 133, 137 (1945); *Campbell v. Westdahl*, 148 Ariz. 432, 715 P.2d 288, 292 (Ct.App.1985). Consequently, we look to the Restatement for guidance regarding how the Arizona Supreme Court would resolve Devaraj's claim.

The Restatement (Second) of Torts § 652B, which sets forth the tort of intrusion upon seclusion, states: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Rest. (2d) Torts § 652B. In a comment to § 652B, the Restatement indicates: "The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." Rest. (2d) Torts § 652B, cmt. c. "There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary man, as the result of conduct to which the reasonable man would strongly object." Rest. (2d) Torts § 652B, cmt. d.

Courts have interpreted § 652B to require a plaintiff to prove (1) an intentional intrusion into a private place, conversation, or matter (2) in a manner highly offensive to a reasonable person. *See Sanders v. Am. Broad. Cos.*, 20 Cal.4th 907, 85 Cal.Rptr.2d 909, 978 P.2d 67, 71 (1999); *People for the Ethical Treatment of Animals ("PETA") v. Bobby Berosini, Ltd.*, 111 Nev. 615, 895 P.2d 1269, 1279 (1995). To prevail on the first prong, the plaintiff must show (a) an actual, subjective expectation of seclusion or solitude in the place, conversation, or matter, and (b)

that the expectation was objectively reasonable. *PETA*, 895 P.2d at 1279; *Kemp v. Block*, 607 F.Supp. 1262, 1264 (D.Nev. 1985); *see also United States v. McIntyre*, 582 F.2d 1221, 1223(9th Cir.1978). The district court granted Defendants' motion for summary judgment on Devaraj's claim of intrusion upon his seclusion on three separate grounds. The district court concluded that any privacy expectation that Devaraj might have had in his conversation with the ABC representatives was not objectively reasonable. *See Med. Lab. II*, 30 F.Supp.2d at 1189. The district court also found that the alleged intrusion was not highly offensive to a reasonable person. *See id.* at 1191. Alternatively, the court held that Devaraj failed to state a claim for intrusion upon his seclusion because he identified no damages from the alleged intrusion apart from those resulting from the publication of *Rush To Read*. *See id.* at 1191–2.

### A. *Devaraj's Expectation of Privacy.*

■ Devaraj identifies his subjective expectation of privacy as an expectation of privacy in the location of his conversation with the undercover ABC representatives, an expectation of privacy in the contents of the conversation, and an expectation that the ABC representatives were not videotaping the conversation for broadcast to the general public. The subjective expectation of privacy may be tested by any outward manifestations that Devaraj expected his dealings with the ABC representatives to be private. *See Kemp*, 607 F.Supp. at 1264. "A comparison of what precautions he took to safeguard his privacy interest with the precautions he might reasonably have taken, is appropriate." *Id.* (citing *Dow Chem. Co. v. United States*, 749 F.2d 307, 312–13 (6th Cir.1984)).

#### 1. Location of his Conversation with ABC Representatives

Devaraj contends that he had a subjective expectation of privacy in Medical Lab's administrative offices where he conducted his meeting with the ABC representatives and gave them a tour. Medical Lab was a semi-public place of business. Although the laboratory portion of Medical Lab was open to the public, Medical Lab's administrative offices were open only to employees and invited individuals. Devaraj, however, extended such an invitation to the three ABC representatives, who were strangers to Devaraj. Devaraj's only knowledge of the three was based upon Gordon's statements that she was a cyto-technologist interested in starting her own laboratory, and upon statements that the other two ABC representatives would be involved in the computer and business administration aspects of Gordon's laboratory.

Devaraj's willingness to invite these strangers into the administrative offices for a meeting and then on a tour of the premises indicates that Devaraj did not have an objectively reasonable expectation of solitude or seclusion in the parts of Medical Lab that he showed the ABC representatives.

Devaraj's very different attitude regarding his personal office space demonstrates this expectation of privacy with respect to the portions of Medical Lab that the ABC representatives visited was not objectively reasonable. At one point during the tour of the premises, Gordon with Cooke not too far behind her walked towards Devaraj's office, the door to which was slightly ajar. Devaraj stopped Gordon, indicating that he did not want her to enter his office, and Gordon complied with his request.[3]

---

**3.** This was the only occasion during the visit

by the ABC representatives when they were

Devaraj's conduct reflects that he considered his office a place sufficiently private and personal that he did not want Gordon, a stranger, to go into it. By contrast, Devaraj's ready exposure of other parts of Medical Lab's administrative offices to the ABC representatives signals that he did not regard these parts as private places. *See PETA*, 895 P.2d at 1281(an animal trainer had no subjective expectation of privacy in a hotel's backstage area where "[h]e had nothing to hide—nothing to be private about"). Thus, the ABC representatives' visit to and tour of Medical Lab's administrative offices did not intrude upon Devaraj's reasonably expected seclusion.

### 2. Contents of his Conversations with ABC Representatives

■ Devaraj also claims that he had an expectation of privacy in the contents of his conversation with the ABC representatives, particularly in the contents of the conversation that transpired in the conference room. To support this expectation, Devaraj asserts that the conversation involved his private affairs and took place mostly behind closed doors in a conference room that he typically used for private conversation.

The transcript of the recorded conversation between Devaraj and the ABC representatives belies Devaraj's contention that he disclosed private matters in the conversation. Devaraj did not reveal any information about his personal life or affairs, but only generally discussed Medical Lab's business operations, the pap smear testing industry, and Gordon's supposed plans to open her own laboratory. This information was, at most, company confidential,[4] not private to Devaraj himself. Privacy is personal to individuals and does not encompass any corporate interest. This common-sense notion that privacy is an aspect of one's personal life is reflected in the law. *See* Rest. (2d) Torts § 652I (indicating that "[t]he right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded" and that "[a] corporation, partnership or unincorporated association has no personal right of privacy"); *Reed*, 162 P.2d at 139(stating that the invasion of privacy action redresses "injury to the person" "that is wholly personal in character").[5] Because Devaraj's conversation with the ABC representatives did not involve his private and personal affairs, Devaraj did not have an objectively reasonable expectation of privacy in the contents of the conversation.

### 3. Secret Videotaping for Future Public Broadcast

■ Lastly, Devaraj argues that he expected that the three undercover ABC

---

asked not to enter a particular area.

4. We doubt that this information was even company confidential. At no point in the conversation did Devaraj indicate that the information disclosed was proprietary or should be treated as confidential. Devaraj also failed to obtain a confidentiality agreement from the ABC representatives. Although Devaraj believed that the ABC representatives might be prospective business partners, he also believed that they planned to open their own laboratory, a possible competitor to Medical Lab. We think that, in divulging confidential and proprietary information to a possible competitor, a reasonable business person

would identify the information disclosed as confidential and proprietary, and would take some precaution to assure that the information remained confidential and proprietary. Devaraj's failure to do so suggests that he did not consider the subject matter of his conversation with the ABC representatives to be *company confidential*.

5. In fact, the district court dismissed Medical Lab's claim for intrusion upon its seclusion on the ground that Medical Lab, as a corporation, has no right of privacy. *See Med. Lab. I*, 931 F.Supp. at 1493. Medical Lab does not appeal this decision.

representatives were not surreptitiously videotaping his dealings with them for broadcast to the general public. Devaraj's argument implicates the privacy interest that the California Supreme Court has termed the "expectation of limited privacy," which is an expectation of privacy against the electronic recording of a communication even though the speaker lacks an expectation of complete privacy in the communication. *See Sanders,* 85 Cal. Rptr.2d 909, 978 P.2d at 71–72. The notion of limited privacy recognizes that although an individual may be visible or audible to some limited group of persons, the individual may nonetheless expect to remain secluded from other persons and particularly from the public at large. *See id.* at 69, 71–77 (holding that an employee engaged in personal conversation with a coworker in an office to which the general public did not have unfettered access could enjoy a limited, but legitimate, expectation that his conversation would not be secretly videotaped by an undercover television reporter, even though the conversation may not have been completely private from other coworkers); *Shulman,* 74 Cal.Rptr.2d 843, 955 P.2d at 491–93 (holding that an injured accident victim could reasonably expect that communications with a rescue nurse that were inaudible to the general public, but possibly overheard by others involved in the rescue, would not be electronically transmitted and recorded by a television producer); *see also Boddie v. Am. Broad. Cos.,* 731 F.2d 333, 339 n. 5(6th Cir.1984) (under the federal wiretap statute, a person may reasonably expect that an oral communication is not being intercepted through the use of electronic devices even though the person does not have an expectation of complete privacy).

Devaraj undeniably held the subjective expectation that the ABC representatives were not secretly videotaping his conversation with them for television broadcast.

Devaraj's ignorance of the covert videotaping was essential to ABC's operation of undercover, investigative journalism. Thus, although Devaraj lacked an expectation of complete privacy in his conversation with three strangers during a business meeting, he could have reasonably expected that the conversation would be confined to them for the most part, and not widely exposed to the public at large. In imparting information to strangers, one inevitably risks its secondhand repetition. *See Sanders,* 85 Cal.Rptr.2d 909, 978 P.2d at 72(citing *Shulman,* 74 Cal.Rptr.2d 843, 955 P.2d at 491). However, as the California Supreme Court has observed, there is "a substantial distinction ... between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or a mechanical device." *Id.* (quoting *Shulman,* 74 Cal.Rptr.2d 843, 955 P.2d at 491). The question before us then is whether Arizona law would recognize as objectively reasonable Devaraj's subjective expectation that his conversation with the ABC representatives would not be broadly disseminated to others, in other words, whether Arizona law would extend legal protection to such an expectation.

Exercising our best judgment, *see Capital Dev. Co.,* 109 F.3d at 519, we conclude that, under Arizona law, Devaraj could not have reasonably expected privacy against the ABC representatives' secret videotaping of his communications with them. We conclude that the Arizona Supreme Court would not recognize as broad an interest in limited privacy as the California Supreme Court has done. In reaching this conclusion, we find significant the differences between the California and Arizona law in the area of electronic eavesdropping. The California Supreme Court's holding in *Shulman*—that an injured accident victim

could reasonably expect that her conversation with a rescue nurse was not being electronically amplified and recorded through a small microphone worn by the nurse—relied upon California's Invasion of Privacy Act, which prohibits the electronic recording of any "confidential communication" without the consent of all parties to the communication. *Shulman,* 74 Cal. Rptr.2d 843, 955 P.2d at 491(citing Cal.Penal Code § 632(a)). Under California law, a "confidential communication" includes "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal.Penal Code § 632(c).

By comparison, Arizona law offers more limited protection against the electronic interception of oral communications. In Arizona, any person present at a conversation may record the conversation without obtaining the consent of the other parties to the conversation. *See* Ariz.Rev.Stat. § 13–3005 (prohibiting the "intentional[ ] intercept[ion] [of] a conversation or discussion at which [one] is not present ... without the consent of a party to such conversation or discussion"); Ariz.Rev. Stat. § 13–3012 (excepting from the statute's eavesdropping prohibition "[t]he interception of any ... oral communication by any person, if the interception is effected with the consent of a party to the communication or a person who is present during the communication ..."). Arizona law thus reflects a policy decision by the state that the secret recording of a private conversation by a party to that conversation does not violate another party's right to privacy. Under Arizona law, then, Devaraj could have no reasonable expectation that the ABC representatives were not surreptitiously videotaping his communications with them.

However, even if we assume that the Arizona Supreme Court would embrace an interest in limited privacy as broad as that articulated by the California Supreme Court, we still conclude that as a matter of law Devaraj's privacy expectation was not reasonable. The expectation of limited privacy in a communication—namely the expectation that a communication shared with, or possibly overheard by, a limited group of persons will nonetheless remain relatively private and secluded from the public at large—is reasonable only to the extent that the communication conveys information private and personal to the declarant. *See Godbehere,* 783 P.2d at 789 ("protection for privacy interests generally applies only to private matters") (citing Rest. (2d) Torts § 652A, cmt. b; *Reed,* 162 P.2d at 138). *Shulman* and *Sanders,* the two California Supreme Court opinions addressing the interest in limited privacy, are illustrative of this point. Both opinions recognized the limited privacy interest in the context of private and personal communications that were intercepted by the press.

*Shulman* involved a patient's conversation with a provider of medical care in the course of emergency treatment at an accident scene. *Shulman,* 74 Cal.Rptr.2d 843, 955 P.2d at 474. The patient's communications with the rescue nurse were intensely private and personal. The patient made statements like, "I'm old," revealing that she was forty-seven, and "I just want to die. I don't want to go through this." *Id.* Although triable issues of fact existed in the case, the California Supreme Court noted the "traditional and legally well-established expectation of privacy" in "[a] patient's conversation with a provider of medical care in the course of treatment." *Id.* at 491. Thus, the California Supreme Court concluded that if the jury found that the patient's communications with the rescue nurse were inaudible to persons not

participating in the rescue effort, then the patient reasonably could have expected that her communications would be confined to the rescue personnel and not electronically transmitted and recorded for television broadcast. *Id.* at 491–93; *see also Sanders,* 85 Cal.Rptr.2d 909, 978 P.2d at 72(stating that *Shulman* so held).

In *Sanders,* the recorded conversation between two coworkers was also of a private and personal nature. The plaintiff "discussed his personal aspirations and beliefs and gave [the defendant] a psychic reading." *Sanders,* 85 Cal.Rptr.2d 909, 978 P.2d at 70. The California Supreme Court held that given that the workplace where this conversation took place was not generally open to the public, the plaintiff could have a reasonable expectation of privacy against a television reporter's covert videotaping of the conversation even though the plaintiff lacked a reasonable expectation of complete privacy because he was visible and audible to other coworkers. *Id.* at 77. Noting that the reasonableness of any expectation of limited privacy in the workplace will depend upon the particular circumstances, the California Supreme Court observed that "greater expectations of workplace privacy may be legally recognized when 'the communication sought to be intercepted is strictly internal ...,'" such as the communication between the coworkers in *Sanders. Id.* (quoting *Commonwealth v. Alexander,* 551 Pa. 1, 708 A.2d 1251, 1257 (1998)). However, "[i]n other circumstances, where, for example, ... the interaction that was the subject of the alleged intrusion was between proprietor (or employee) and customer, any expectation of privacy against press recording is less likely to be deemed reasonable." *Id.*

The California Supreme Court distinguishes between "internal" and "external" workplace communications in assessing the likely reasonableness of any expectation of limited privacy. Unlike the "internal" conversation between coworkers in *Sanders,* an "external" conversation between a workplace insider, such as a proprietor, and a workplace outsider, like a customer, is more probably business-related and thus not sufficiently private and personal in character to make any privacy expectation reasonable. For example, in *Desnick v. American Broadcasting Cos.,* 44 F.3d 1345 (7th Cir.1995), test patients covertly videotaped their conversations with ophthalmic surgeons who recommended cataract surgery to the test patients. *Desnick,* 44 F.3d at 1348. The Seventh Circuit held that the surgeons had failed to state a claim for invasion of privacy because "[t]he test patients entered offices that were open to anyone expressing a desire for ophthalmic services and videotaped physicians engaged in professional, not personal, communications with strangers (the testers themselves)." *Id.* at 1352. Accordingly, there was no "invasion of a person's private space," no "intrusion into legitimately private activities," and "no eavesdropping on a private conversation" that revealed "intimate personal facts concerning the two individual plaintiffs." *Id.* at 1352–53.

Likewise, in *Wilkins v. National Broadcasting Co.,* 71 Cal.App.4th 1066, 84 Cal. Rptr.2d 329 (1999), television producers posing as potential investors in a telecommunications company secretly videotaped a business meeting that they had with salespersons from the telecommunications company. The California court of appeal ruled that the salespersons' claim that the surreptitious videotaping intruded upon their seclusion did not survive the television producers' motion for summary judgment. *Wilkins,* 84 Cal.Rptr.2d at 332. Because the salespersons "discussed business matters on the open patio of a public restaurant with four strangers," "[t]here was no

intrusion into a private place, conversation or matter." *Id.* at 336. The court of appeal stressed that the secret videotaping did not constitute "physical or sensory intrusion into [the salespersons'] privacy," or intrusion "into the[ir] personal lives, intimate relationships, or any other private affairs." *Id.*

The case currently before us involves the covert videotaping of "external" workplace communications much like those recorded in *Desnick* and *Wilkins*. Devaraj, in his capacity as Medical Lab's founder and co-owner, invited three strangers whom he regarded as potential business partners, but also possible competitors, to the Medical Lab offices where they discussed business, not personal matters. As already discussed, Devaraj held no objectively reasonable expectation of privacy in the parts of Medical Lab that he showed the undercover ABC representatives. The videotaping therefore did not intrude upon any private place of his. Devaraj's subjective expectation of privacy in the contents of his conversation with the ABC representatives, which was wholly business-re-

lated and did not implicate Devaraj's private and personal affairs, was also not objectively reasonable. Thus, the videotaping did not invade any conversation or matter that was private to Devaraj. In short, Devaraj presented himself to the three strangers from ABC as no more than a public face and voice for Medical Lab. Given that Devaraj cannot assert a privacy right on behalf of Medical Lab, *see* Rest. (2d) Torts § 652I, Devaraj could have no reasonable expectation of limited privacy in a workplace interaction with three strangers that was purely professional and touched upon nothing private and personal to Devaraj himself.[6] *See Desnick*, 44 F.3d at 1352–53; *Wilkins*, 84 Cal.Rptr.2d at 336.

We conclude that while Devaraj may have maintained a subjective expectation of privacy over the location of his conversations with the undercover ABC representatives, an expectation of privacy in the contents of the conversation, and an expectation that against the ABC's secret videotaping of his communication for future

---

**6.** The cases that Devaraj relies upon do not call for a contrary conclusion. *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir.1971), is distinguishable from the instant case because it involved an intrusion into a plaintiff's private affairs in his home, where it is well-established that privacy interests are most potent. *See Minnesota v. Carter*, 525 U.S. 83, 99, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people."). As the Seventh Circuit pointed out in *Desnick*, the *Dietemann* plaintiff's quack healing of nonexistent ailments, which the defendant-journalists clandestinely recorded, was his private hobby, not a professional business service. *See Desnick*, 44 F.3d at 1352–53. The plaintiff administered his so-called treatments in the den of his home to people who visited him. He did not advertise his treatments, had no telephone, and did not charge or accept contributions for his treat-

ments. *See Dietemann*, 449 F.2d at 246–47. As the Seventh Circuit noted, "[h]is quackery was private." *Desnick*, 44 F.3d at 1353. Devaraj also cites *Benford v. American Broadcasting Cos.*, 554 F.Supp. 145 (D.Md.1982), which held that an insurance salesman who gave his standard cancer-insurance sales presentation in a private home to persons posing as prospective purchasers could reasonably expect privacy against the surreptitious filming of that presentation. We question the continuing validity of the *Benford* holding in light of the Supreme Court's decision in *Carter* that persons invited to another's home for a relatively short period of time simply to do business have no legitimate expectation of privacy there. *Carter*, 525 U.S. at 90–91, 119 S.Ct. 469. In any event, to the extent that *Benford* held that persons can reasonably expect limited privacy in business-related communications with strangers, we do not find the opinion persuasive.

broadcast to the general public, these expectations were not objectively reasonable.

### B. The Offensiveness of the Alleged Intrusion.

■ Even if we assume that, under Arizona law, the ABC representatives' secret videotaping intruded upon Devaraj's reasonable expectation of privacy, the intrusion was not sufficiently offensive to state a claim for intrusion upon seclusion.

■ In determining whether a jury could reasonably find an alleged intrusion highly offensive, we have previously considered "the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Deteresa v. Am. Broad. Cos.*, 121 F.3d 460, 465 (9th Cir.1997). Although no Arizona case indicates what sort of conduct constitutes a highly offensive intrusion, the illustrations in the comments to the Restatement (Second) of Torts § 652B suggest that it must be an exceptional kind of prying into another's private affairs. *See* Rest. (2d) Torts § 652B, cmt. b. (offering the following examples: (1) taking the photograph of a woman in the hospital with a "rare disease that arouses public curiosity" over her objection, and (2) using a telescope to look into someone's upstairs bedroom window for two weeks and taking "intimate pictures" with a telescopic lens). Moreover, when a member of the print or broadcast press commits an intrusion in order to gather news, the public's interest in the news may mitigate the offensiveness of the intrusion. *See Godbehere*, 783 P.2d at 788–89 (recognizing that the right to privacy should be balanced against the public interest in the information); ·*Reed*, 162 P.2d at 138 (noting that privacy rights are absent or limited "where the informa-

tion would be of public benefit"); *see also Shulman*, 74 Cal.Rptr.2d 843, 955 P.2d at 493–94 ("[T]he constitutional protection of the press does reflect the strong social interest in effective and complete reporting of events, an interest that may—as a matter of tort law—justify an intrusion that would otherwise be considered offensive.").

Any intrusion by the ABC representatives was *de minimis* and thus not highly offensive to a reasonable person. The covert videotaping of a business conversation among strangers in business offices does not rise to the level of an exceptional prying into another's private affairs, which the Restatement's illustrations indicate is required for "offensiveness." *See* Rest. (2d) § 652B. cmt. b. In addition, any offensiveness of the alleged intrusion is mitigated by the public interest in the news gathered for *Rush To Read.* "[W]hether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). There can be no doubt, as the district court found, that "[i]nformation about a medical issue with potential life and death consequences affecting millions of women is plainly an issue of public concern." *Med. Lab. II*, 30 F.Supp.2d at 1193 n. 11.

The district court properly granted Defendants' summary judgment motion on Devaraj's claim of intrusion upon his seclusion. As a matter of law, the ABC representatives did not intrude upon any objectively reasonable expectation of privacy held by Devaraj, and the alleged intrusion

was not highly offensive.[7]

## II. *Trespass.*

■ Before the district court, Medical Lab argued that the ABC representatives had trespassed, and sought damages from the publication of *Rush To Read* on the ground that the ABC representatives had obtained footage for the television segment through their trespass. Medical Lab did not request nominal damages, nor did it claim to have suffered any other damages as a result of the alleged trespass.[8] The district court concluded that although the ABC representatives had trespassed, the trespass was not the legal cause of the claimed publication damages. *See Med. Lab. II,* 30 F.Supp.2d at 1204. Medical Lab appeals the district court's damages analysis, which we affirm.

Even if we assume that the ABC representatives committed a trespass, Medical Lab fails to sustain its burden of proving the damages it seeks. The Arizona courts have adopted the test of legal causation set forth in the Restatement (Second) of Torts §§ 430 et seq., which applies to both intentional and negligent torts. *See* Rest. (2d) Torts § 431, cmt. e (noting that the test of legal causation set forth in § 431 applies equally to intentional and negligent torts); *Standard Chartered PLC v. Price Waterhouse,* 190 Ariz. 6, 945 P.2d 317, 343 (Ct. App.1996) (citing the Restatement (Second) of Torts § 431 for the test of legal causation); *Shetter v. Rochelle,* 2 Ariz.App. 358, 409 P.2d 74, 83 (Ct.App.1965) (applying the Restatement (Second) of Torts § 432); *see also Reed,* 162 P.2d at 137 (the Arizona Supreme Court follows the Restatement when "not bound by previous decisions or by legislative enactment"). Tortious conduct is "a legal cause of harm to another if" the "conduct is a substantial factor in bringing about the harm." Rest. (2d) Torts § 431.

*Rush To Read* used only 52 seconds of videotape obtained from the ABC representatives' alleged trespass on Medical Lab's property. This 52 seconds of videotape showed Devaraj seated, stating that cytotechnologists that work at Medical Lab also work at other laboratories. Medical Lab fails to identify any damages flowing specifically from this 52–second videotape clip. Moreover, the evidence of injury to Medical Lab's reputation and business in the aftermath of *Rush To Read*'s broadcast shows that Medical Lab's failure to detect cervical cancer on several of the pap smear slides in the ABC study caused the damages that Medical Lab seeks, not Devaraj's statement about Medical Lab's cytotechnologists. Doctors that terminated their business relationships with Medical Lab after *Rush To Read* aired testified that they did so because of Medical Lab's "problems with processing . . . pap smears." Both doctors and patients were not "comfortable sending lab work there." The doctors "repeat[ed] several pap smears at patients' requests," and "even sent some biopsy

---

7. We do not reach the district court's alternative holding that Devaraj failed to state a claim for intrusion upon his seclusion because he identified no damages from the alleged intrusion apart from those resulting from the publication of *Rush To Read.*

8. Medical Lab asserts damages unrelated to the broadcast of *Rush To Read* for the first time on appeal in its reply brief. Medical Lab has waived any claim for these damages because it failed to present them to the district court, and also failed to raise them in its opening brief. *See Arizona v. Components Inc.,* 66 F.3d 213, 217 (9th Cir.1995) (parties waive those arguments that they do not "raise[ ] sufficiently for the trial court to rule on [them]"); *Laboa v. Calderon,* 224 F.3d 972, 981 n. 6 (9th Cir.2000) (claims not specifically and distinctly argued in an appellant's opening brief are waived on appeal).

specimens, again, to the hospital for second confirmations." The doctors stopped using Medical Lab's services because they "felt an obligation to [their] patients to give them laboratory services that were beyond question."

The Restatement recognizes that "[s]ome other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect 14565 of the [tortious conduct] insignificant and, therefore, to prevent it from being a substantial factor." Rest. (2d) Torts § 433, cmt. d. Such was the case here. The doctors' testimony indicates that Medical Lab's performance in the ABC study, missing cervical cancer on several of the pap smear slides, was the predominant factor in their decisions to discontinue their business with Medical Lab. Any injurious effect from Devaraj's statement that Medical Lab's cytotechnologists work at other laboratories as well, a statement captured on videotape by the ABC representatives during their alleged trespass, was negligible by comparison. Accordingly, we find no support in the record for a conclusion that the alleged trespass by the ABC representatives was a substantial factor in bringing about the damages that Medical Lab suffered from the broadcast of *Rush To Read.* *See* Rest. (2d) Torts § 431. Because the alleged trespass was not the legal cause of the publication damages that Medical Lab seeks, the district court properly granted Defendant's motion for summary judgment on Medical Lab's trespass claim.

### III. *Tortious Interference with Contractual Relations and Prospective Economic Relations.*

Medical Lab contends that Defendants' broadcast of *Rush To Read* tortiously interfered with its contractual relations and prospective economic relations. As discussed in the context of Devaraj's claim of intrusion upon his seclusion, *Rush To Read* addressed a subject of unquestionable public concern—the frequency of testing errors by medical laboratories that analyze women's pap smear slides for cervical cancer. *See Dun & Bradstreet,* 472 U.S. at 761–62, 105 S.Ct. 2939. Given this public interest in the publication of *Rush To Read,* the First Amendment requires Medical Lab to demonstrate the falsity of the statements made in the television segment, as well as Defendants' fault in broadcasting them, before recovering damages. *See Unelko Corp. v. Rooney,* 912 F.2d 1049, 1058 (9th Cir.1990) (when a claim of tortious interference with business relationships is brought as a result of constitutionally protected speech, the claim is "subject to the same first amendment requirements that govern actions for defamation"); *Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 973 (3d Cir.1985) (unless defendants "can be found liable for defamation, the intentional interference with contractual relations count is not actionable"); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655,* 39 F.3d 191, 196 (8th Cir.1994) (the constitutional requirements for defamation "must equally be met for a tortious interference claim based on the same conduct or statements"; otherwise "a plaintiff may ... avoid the protection afforded by the Constitution ... merely by the use of creative pleading").

To establish *Rush To Read*'s falsity, Medical Lab must show more than a "slight inaccuracy in the details." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified. Put another way, the statement is not considered false unless it would have a different effect on the mind

of the reader from that which the pleaded truth would have produced." *Id.* (internal quotations and citations omitted); *accord Currier v. W. Newspapers, Inc.,* 175 Ariz. 290, 855 P.2d 1351, 1354 (1993) ("[S]light inaccuracies of expression are immaterial if the alleged defamatory statement is true in substance.") (internal quotations omitted).

The district court held that Medical Lab failed to raise any triable issues of fact regarding *Rush To Read*'s falsity. *See Med. Lab. II,* 30 F.Supp.2d at 1186. Medical Lab appeals this decision, arguing that the television segment made five separate false statements. We consider each statement in turn.

### A. Medical Lab's Performance on the Four "Unmistakable" Slides.

■ Of the 623 pap smear slides used in the ABC study, Dr. Mathilde Boon, a Dutch pathologist, provided 100, four of which Dr. Boon characterized as "unmistakable" slides that any laboratory should identify as "abnormal cases." After testing Dr. Boon's four "unmistakable" slides, Medical Lab reported that two were abnormal, one was "unsatisfactory," and the other was "within normal limits." *Rush To Read* reported Medical Lab's performance on the four slides as follows:

> Diane Sawyer: So, how did this lab do on our slides? Well, on Dr. Bowen's [sic] slides, this lab missed two of the four Dr. Bowen [sic] had called "unmistakable," both clear-cut cancer.
>
> Dr. Matilda Bowen [sic]: Absolutely should have been picked up, yes.
>
> Diane Sawyer: That any responsible laboratory should have picked these four up.
>
> Dr. Matilda Bowen [sic]: Yes.

Medical Lab argues that the broadcast's statement that it "missed two of the four" "unmistakable," "clear-cut cancer" slides is not substantially true because Medical Lab did not misread as normal one of these slides, but rather designated it "unsatisfactory."

In support of its argument, Medical Lab cites the testimony of Dr. Charles Santos–Buch, a Cornell Medical School pathology professor, who was one of Defendants' retained experts for the ABC study. Dr. Santos Buch testified that Medical Lab did not "misread" the slide at issue, but rendered "an interpretation" that "the number of red blood cells is obscuring the samples so they cannot be read." He explained that when a laboratory finds a sample "unsatisfactory for diagnosis," the attending physician must "make another appointment with that patient and get a repeat sample."

Medical Lab further relies upon the notes taken contemporaneously with Dr. Santos–Buch's evaluation of this particular slide before *Rush To Read* aired. These notes indicate that Dr. Santos–Buch found the slide to contain "a lot of blood" and to be "limited for interpretation" because of "limited specimen." However, critically, these notes also show that Dr. Santos–Buch did not conclude that the slide was unsatisfactory, or could not be read, because of limited specimen or the presence of red blood cells. Rather, he determined that the slide was "clearly an abnormal." His opinion was that there was "[n]o question there is an abnormality here." Dr. Santos–Buch reiterated this point of view in his later testimony. When asked whether there was "any hesitancy in [his] opinion" that all four of Dr. Boon's "unmistakable" slides were indeed abnormal, Dr. Santos Buch responded unequivocally, "It was quite evident all four were abnormal."

Dr. Laurie Mango, a pathologist at Neuromedical Systems, Inc. whom Defendants also retained as an expert in the ABC

study, confirmed the opinions of Dr. Santos Buch and Dr. Boon with respect to the four "unmistakable" slides.. Dr. Mango's evaluation of the slides concluded that "all four show clear evidence of abnormality." In Dr. Mango's judgment, "any cytopathologist would agree that all four of these smears are abnormal." Dr. Mango believed that Medical Lab's designation of the slide as "unsatisfactory" was a grave oversight. She explained that "[i]n cytopathology, a smear can only properly be reported as unsatisfactory if both of the following are true: (1) the smear is not found to contain any evidence of abnormality, and (2) the smear fails to display sufficient evidence to allow for proper evaluation." Thus, in Dr. Mango's opinion, "Given the unequivocal evidence of abnormality displayed on [the] smear ..., this smear should not have been reported as inadequate."

In sum, the shared opinion of the experts, including Dr. Santos Buch upon whom Medical Lab relies, was that the slide at issue contained enough clearly identifiable evidence of abnormal, cancerous cells that any laboratory examining the sample should detect and report the abnormality. Medical Lab did not detect and report the abnormality. Thus, the statement that Medical Lab "missed" the "unmistakable" "clear-cut cancer" on this slide is substantially true. That Medical Lab deemed the pap smear sample unsatisfactory, rather than normal, is not information that would have created a different impression upon the mind of the viewer. *See Masson,* 501 U.S. at 517, 111 S.Ct. 2419; *Currier,* 855 P.2d at 1354. The district court correctly determined that this claim of falsity must fail.

B. *The Lost Slides.*

■ In addition to the 100 pap smear slides contributed by Dr. Boon, Defendants collected 523 slides from gynecologists who agreed to participate in the ABC study by taking two pap smears from each patient and sending one to the gynecologist's regular medical laboratory and the other to *PrimeTime Live* to be tested by the four laboratories profiled in *Rush To Read.* By analyzing both the actual slides and digital images of the pap smears taken by a computer screening device known as PapNet, Dr. Boon and Dr. Jonathan Weintraub, an American pathologist working in Switzerland, identified 19 of the 523 slides as "clear-cut precancerous abnormal slides." In *Rush To Read,* Diane Sawyer reported that the Arizona laboratory had "missed" three of these 19 abnormal slides. Prior to the broadcast, however, during Dr. Mango's travel to New York from Switzerland, where Drs. Boon and Weintraub had reviewed the slides, a number of the slides were lost, including the three that *Rush To Read* indicated that Medical Lab had missed.

Before the district court, Medical Lab presented no evidence that the three abnormal slides that it allegedly had missed, by diagnosing them as normal, were not in fact abnormal. Rather, Medical Lab argued that Defendants' loss of the three slides justified an inference adverse to Defendants—an inference that the slides were normal and that therefore the broadcast's statement that Medical Lab had missed the abnormalities in the samples was false. *See Med. Lab. II,* 30 F.Supp.2d at 1195. The district court declined to allow the inference because there was no evidence that Defendants had acted in bad faith, and Medical Lab had available to it means to challenge the validity of Defendants' conclusion that the slides were abnormal. *Id.* at 1195–96. Medical Lab could have analyzed the PapNet data, which preserved digital images of the pap smears, and also could have deposed Drs.

Boon and Weintraub, but Medical Lab chose not to. *Id.* at 1195.

■ "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993). This power includes the power to sanction the responsible party by instructing the jury that it may infer that the spoiled or destroyed evidence would have been unfavorable to the responsible party. *Id.; Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). As a discretionary power, the district court's exercise of that power is reviewed by this court only for abuse of discretion. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367 (9th Cir.1992). We conclude that the factors considered by the district court provided ample basis for the court's discretionary decision to refuse the adverse inference that Medical Lab requested.

The district court appropriately observed that Defendants' loss of the pap smear slides did not evidence bad faith, was not intentional, and reflected only inadvertence that at most was negligence. Dr. Mango testified that she had the box of slides with her in her hotel room in Geneva the evening before she left Switzerland for New York, but that she either misplaced the slides, or they were stolen from her, "somewhere between that hotel room and landing in New York City." Dr. Mango realized "at the luggage carousel … [that she] did not have th[e] box of slides with [her]." Dr. Mango "was very upset" about the loss of the slides, personally flew back to Geneva to search for them, and even hired a private investigator to locate them. Robbie Gordon at ABC was also "distressed" by the loss of the slides, viewed it as "a very big problem," and thought that "it was important

that [Dr. Mango] find them." Through her investigatory efforts, Dr. Mango learned that the taxidriver in Geneva that had taken her to the airport remembered that she had the box of slides with her when she exited the taxi. However, Dr. Mango was unable to recover the slides for Defendants.

■ The district court did not abuse its discretion in relying upon the absence of bad faith or intentional conduct by Defendants. When relevant evidence is lost accidentally or for an innocent reason, an adverse evidentiary inference from the loss may be rejected. *See Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996). The district court did not abuse its discretion by concluding that, under the totality of the circumstances, an unfavorable inference was not warranted because a rational jury would not infer that Defendants' loss of the slides indicated that the slides threatened Defendants' legal position and needed to be covered up. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir.1995) (the district court did not abuse its discretion in refusing an unfavorable inference when the circumstances indicated that the evidence was not intentionally lost and the responsible party searched for it, but to no avail); *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 716 (7th Cir.1998) (the inference that a missing record contained adverse evidence was not justified when the record's loss was inadvertent); *see also Akiona*, 938 F.2d at 161 (noting that "a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy the [evidence] is more likely to have been threatened by the [evidence] than is a party in the same position who does not destroy the [evidence]," and that the adverse inference is based upon evidentiary and deterrence rationales) (quoting *Welsh*

*v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988)).

The availability of other evidence to Medical Lab to challenge the broadcast's statement regarding the three missing slides, and Medical Lab's failure to pursue this evidence, also formed proper bases for the district court's exercise of its discretion. When a proponent cannot produce original evidence of a fact because of the inadvertent loss of the evidence, proof by secondary evidence is permissible. *See* Fed.R.Evid. 1004(1). The digital images of the pap smears retained in the PapNet data offered such secondary evidence. According to Dr. Mango's testimony, although the PapNet data was not as reliable as the original slides, the two-dimensional computer images showed sufficient diagnostic cells in some cases to permit diagnosis of a pap smear. In addition to the PapNet images, records retained by the medical laboratories and doctors that had examined the original slides were available evidence. Furthermore, as the district court noted, Medical Lab could have deposed Drs. Boon and Weintraub regarding their evaluations of the slides. Given Medical Lab's failure to rely upon any of this not-insubstantial evidence to prove the broadcast's falsity, the district court did not abuse its discretion in ruling that Defendants' inadvertent loss of the slides, by itself, was not enough for Medical Lab to survive summary judgment on its falsity claim. *See Kronisch v. United States,* 150 F.3d 112, 128 (2d Cir.1998) (when a party "has produced no evidence—or utterly inadequate evidence—in support of a given claim", "the destruction of evidence, standing alone, is [not] enough to allow [the] party . . . to survive summary judgment on that claim"); *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 107 (2d Cir.2001) ("In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for

the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.") (quoting *Kronisch,* 150 F.3d at 128).

### C. *The Broadcast's Report on Error Rates in the Industry.*

 *Rush To Read* stated that "[e]xperts say with human fallibility, everyone makes mistakes, but labs should strive to miss no more than five percent of the slides that are abnormal." Medical Lab does not dispute the truth of this aspirational benchmark. Rather, Medical Lab faults the broadcast for omitting any discussion of the actual industry error rate. The district court correctly held that the absence of this information did not render the broadcast false. "The choice of material to go into a [broadcast], and the . . . treatment of public issues . . .—whether fair or unfair—constitute the exercise of editorial control and judgment." *Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The decision not to include information about the true range of error in the industry was an editorial decision protected by the First Amendment. *See id.; see also Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 510 (9th Cir.1988) ("[T]he First Amendment does not allow the government to require independent filmmakers to present all views on a subject, or indeed any view contrary to the filmmakers' own.").

### D. *The Broadcast's Statement that Medical Lab Offered 24–Hour Service.*

*Rush To Read* represented that "[a]ll four labs offered 24–hour service, including the one in Arizona." Charleston, the ABC producer who posed as a representative of the fictitious Michigan women's health clinic, sent a letter to Devaraj that said: "To confirm our agreements: you have promised a 24 hour turn-around on the

slides." Devaraj testified that he received the letter and admitted that it constituted an "agreement" that Medical Lab had with the fictitious clinic. Accordingly, the district court properly rejected Medical Lab's argument that the broadcast falsely stated that the Arizona laboratory offered 24–hour service.

E. *The Broadcast's Statement that Medical Lab's Cytotechnologist "Worked Two Exhausting 13–Hour Days".*

 *Rush To Read* declared that one of Medical Lab's cytotechnologists "read 172 of our slides while doing other work as well, paperwork, filing, working two exhausting 13 hour days." Medical Lab argues that this statement is false because the cytotechnologist, Florence Sanchez ("Sanchez"), worked only 10 hours and 40 minutes on the second day. The district court declined to consider this argument because it was untimely. *See Med. Lab. II*, 30 F.Supp.2d at 1197 n. 15. We have held that "[d]istrict court judges must have ample discretion to control their dockets." *Murray v. Laborers Union Local No. 324*, 55 F.3d 1445, 1452 (9th Cir. 1995). We find no abuse of discretion in the district court's decision not to pass upon the claim, which Medical Lab filed in a supplemental opposition three weeks after the court's deadline for responses to Defendants' summary judgment motion. *See Med. Lab. II*, 30 F.Supp.2d at 1197 n. 15. In any event, any abuse of discretion by the district court in refusing to rule on Medical Lab's belatedly presented claim was not prejudicial because the broadcast's statement was substantially true.

Based upon Defendants' videotaping of her comings and goings that weekend, Sanchez worked a total of about 25 hours, approximately 14 hours on the first day and almost 11 on the second. Although the broadcast understated her hours on the first day and overstated them on the second, the broadcast's representation produces no "different effect on the mind of the [viewer] from that which the pleaded truth would ... produce[ ]." *Masson*, 501 U.S. at 517, 111 S.Ct. 2419; *see also Currier*, 855 P.2d at 1354. The minor inaccuracy does not amount to falsity because "the gist"—that Sanchez worked two long days—can be justified. *See Masson*, 501 U.S. at 517, 111 S.Ct. 2419. Medical Lab does not create a triable issue of fact regarding the broadcast's falsity on this point, and thus suffered no prejudice from the district court's rejection of the argument as untimely.

We agree with the district court that Medical Lab does not raise any triable issues of fact regarding *Rush To Read*'s falsity. Accordingly, we affirm the district court's grant of summary judgment in Defendants' favor on Medical Lab's claim of tortious interference with contractual relations and prospective economic relations.

### IV. *Punitive Damages.*

 The district court properly granted Defendants' motion for summary judgment on Plaintiffs' punitive damages claims because Plaintiffs "must be entitled to actual damages before being entitled to punitive damages." *Wyatt v. Wehmueller*, 167 Ariz. 281, 806 P.2d 870, 874 (1991). Because the claims that Plaintiffs raise on appeal lack merit, Plaintiffs are entitled to neither actual nor punitive damages.

The district court's judgment is **AFFIRMED.**